Arthur SMITH, Appellant,

v.

J. LAURITZEN,

v.

JARKA CORPORATION OF PHILADELPHIA, Third-Party Defendant.

No. 14941.

United States Court of Appeals
Third Circuit.

Submitted Oct. 6, 1965.*

Argued Jan. 7, 1965.

Decided Feb. 9, 1966.

Rehearing Denied March 4, 1966.

* On October 8, 1965, a Second Amended Complaint was filed, pursuant to leave granted, properly pleading diversity of citizenship.

See also D.C., 201 F.Supp. 663.

John Dorfman, Philadelphia, Pa., for appellant.

John T. Biezup, Philadelphia, Pa. (Rawle & Henderson, Philadelphia, Pa., on the brief), for Lauritzen.

Joseph R. Thompson, Philadelphia, Pa., for Jarka Corp.

Before BIGGS, Chief Judge, and KALODNER and SMITH, Circuit Judges.

KALODNER, Chief Judge.**

In the instant case the plaintiff, a longshoreman, sued the defendant J. Lauritzen, owner of the S.S. Gerda-Dan, in a maritime action for injuries sustained when he was assaulted on June 16, 1959, by a fellow longshoreman with a cargo hook while they were discharging the vessel's cargo. The Complaint alleged unseaworthiness of the vessel in that the plaintiff's assailant was not equal in temperament and disposition to the ordinary men of his calling. The jury returned a verdict of $2,000 in favor of the plaintiff against the defendant Lauritzen. It also returned a verdict of $2,000 against the third-party defendant Jarka Corporation of Philadelphia, a stevedore employer of the plaintiff and his assailant. Jarka had been joined by Lauritzen as third-party defendant on an indemnity claim.

The plaintiff appealed when the District Court denied his motion for a new trial which was based on alleged errors in the charge to the jury. Jarka has not appealed.

The plaintiff here asks a new trial limited to the issue of damages, or in the alternative, a new trial on all issues.

He urges, inter alia, that the trial judge erred in charging the jury that (1) "if the assault was justified in self-defense * * * the vessel was not unseaworthy"; (2) "if the assault was * * * sufficiently provoked, the vessel was not unseaworthy"; and (3) "I think you should consider that they [plaintiff and assailant] were both using the [cargo] hook, admittedly everyday tools of their trade, and there is no testimony that Frank Smith [the assailant] went to get the hook to beat up the plaintiff. In other words, what I am trying to say is that I think you should take into consideration the fact that when this fight broke out they were both using hooks".

It is necessary to consider the evidence adduced at the trial before proceeding to a discussion of the plaintiff's stated contentions.

The record discloses that on the day of the assault the plaintiff, ("Arthur"), and his alleged assailant Frank Smith, ("Frank"), were unloading bags of sugar from the hold of the S.S. Gerda-Dan, and that some time after they commenced to perform their work, Frank attacked Arthur from behind with a cargo hook or hooks, inflicting severe head injuries. The incidents relating to the attack were variously described by the witnesses at the trial.

James Rich, a rigger and a fellow longshoreman, testified that he had observed the action from above; Arthur and Frank had gotten into a "rumble"; and that "Frank had took the hook and hit Arthur in the head three or four times." Asked on direct examination what he meant by "rumble", Rich answered, "I heard the talking. I heard they were talking. Then I looked down the hold. I was standing right over the hatch. * * * I heard a noise down in the hatch. I heard a noise and then I look around and that time I saw Frank hitting Arthur in the head with the hook, so that must be what I hear him was talking about. * * * Arthur was bent over. He had both of his hands sticked in a bag to raise it up to put in the draft." And on cross-examination in response to the question, "And by rumble do you mean quarrel, that Frank and Arthur were quarreling?" he testified, "No they wasn't quarreling. I heard the talking and I looked around and Frank was hitting Arthur in the head with the hook. Whether it was Frank talking or Arthur talking, I didn't heard Arthur say anything but I know Frank's voice because I worked with him." And to the further question on cross-examination, "And by rumble you mean you heard Arthur and Frank argu-

** Judge Kalodner became Chief Judge on October 7, 1965.

ing?" he replied, "No, no. I didn't say Arthur and Frank. I said I heard Frank voice"; and to the question, "Did you hear people arguing?" he responded, "Oh, I wouldn't say they was arguing because Arthur had both his hooks in the bag to lift it up to put it in the sling; and then when I looked down Frank was hitting Arthur in the head with the hook."

Leroy Stevens, another fellow longshoreman, a defense witness, who apparently saw the entire occurrence, testified as follows:

"By the Court:

"Q. Now you heard them arguing, didn't you?

"A. Yes.

"Q. Did you see any motions made one to the other?

"A. Well, Arthur hit Frank.

"Q. Arthur hit Frank?

"A. Yes. * * * And Frank didn't say anything, but he waited until Arthur bend to sweep the bag, and then he took his hook and he hit him aside the head. * * * "

And to the question, "Did those men [the men working in the hold, including Arthur and Frank] have any tools with them at the time?" he replied, "They all had two hooks, all but the hook runner."

On cross-examination Stevens again described the incidents leading up to the attack:

"By Mr. Dorfman [Plaintiff's counsel]:

"Q. I am just interested in learning what you saw the first time you looked into the hold.

"A. When I looked into the hold, they were arguing.

"Q. They were arguing?

"A. Yes. That's what started it. They started to argue." * * *

* * * * * *

"Q. Tell us what happened as they were arguing.

"A. They were arguing about the work.

"Q. What happened after the argument? Was it an argument of words?

"A. Argument of words, and then it turned into a fight.

"Q. Now tell us how it turned into a fight.

"A. Arthur hit Frank.

"Q. Arthur hit Frank?

"A. Yes.

"Q. With what?

"A. With his fist.

"Q. With his fist? Did Arthur have hooks in his hand at the time?

"A. I guess he did. He works with two hooks.

"Q. Well, did he have his hooks in his hands when he hit Frank?

"A. I think he put his hooks away.

"Q. You think he put his hooks away?

"A. He put them down, yes.

"Q. And Arthur hit Frank?

"A. Yes.

"Q. With his fist?

"A. Yes.

"Q. Then what happened?

"A. Then Arthur took his hooks up and begin to work. He bend over to sweep the bags. That's when Frank hit him with the hook."

* * *

* * * * * *

"Q. Arthur's hooks were in the bag?

"A. Yes. He had them stuck in the bag, yes.

"Q. And at that point Frank hit Arthur?

"A. Yes."

Frank and Arthur also testified to what had happened.

On direct examination Frank was asked:

"Q. Do you remember this fight that happened on June 16, 1959?

"A. Yes." * * *

* * * * * *

"Q. Could you tell us in your own words the events that led up to the fight and the fight itself?" * * *

"A. Yes. He came in the hatch there and they told me about my head. They used to make me mad because they said I had a silver plate in my head and they used to kid me and say they was going to knock the silver plate off my head.

"Q. And then what happened?

"A. Well, I just go on and work, but that morning we had a little misunderstanding again so I just got tired and hit him with the hook.

"Q. I see.

"A. Yes.

"Q. And that was after he said he was going to hit you—

"A. Yes.

"Q. —on the head?

"A. Yes.

"Q. On your plate, is it?

"A. Yes. I haven't got no plate, though.

"Q. You don't have a plate in your head?

"A. No, but they say I have a plate.

"Q. Did Arthur Smith have any things in his hand at the time he made that threat?

"A. Yes. He had two hooks, just like I had.

"Q. Where did he have the hooks at the time he made that statement?

"A. We were loading the sugar, getting ready to load the sugar. We had loaded and then we finished putting the bag over the rope. Then we started the argument again, so I just hit him with the hook."

Arthur admitted that he and Frank had argued, but stated that the argument, which had pertained to work procedure, occurred some fifteen minutes before the attack. As to the attack itself Arthur testified as follows:

"Q. Will you tell us what happened to you on that day?

"A. Well, on this morning me and Frank was working. I was bent, bent over to put a bag in the rope. Well, when I felt something hit me on the head, and then I felt it again and then it came again. At first I thought it was the man on the deck that throwed a rope sling in the ·hold for us to load the bags. Then it came again and I found myself blacking out and at the last instant it came, it dawned on me that I was being clobbered over the head with these cargo hooks."

The plaintiff testified that he had incurred some $1,300 in medical expenses, allegedly as a result of the attack by Frank. The defendant agreed that $1,300 was a reasonable approximation of the costs incurred, but denied that any of this sum, except $49.50 came as the result of the attack. The plaintiff also claimed that he had lost some $4,300 in wages as a result of injuries incurred in the attack. The defendant denied this, and attempted to show that at the very most lost wages totaled $432.

As earlier stated, the theory upon which the case was tried and presented to the jury was that the plaintiff's injuries resulted from the unseaworthiness of the defendant's ship due to the fact that Frank was not equal "in temperament and disposition to the ordinary men of his calling". Such a theory is normally susceptible to one of two modes of proof: (1) by independent evidence with regard to the assailant's temperament and disposition, or (2) by direct evidence showing a vicious and unprovoked attack. See Clevenger v. Star Fish & Oyster Company, Inc., 325 F.2d 397 (5th Cir. 1963); Walters v. Moore-McCormack Lines, Inc., 309 F.2d 191 (2 Cir. 1962); Jones v. Lykes Bros. Steamship Co., Inc., 204 F.2d 815 (2 Cir. 1953). From the record it is apparent that the plaintiff chose the second mode of proof.

Coming now to the three grounds upon which the plaintiff premises his con-

tention that the trial court erroneously and prejudicially charged the jury:

First, as to the court's instruction, "If the assault was justified in self-defense * * * the vessel was not unseaworthy."

■■ The instruction was not justified by the testimony and was erroneous for that reason. Critical to the theory of self-defense, whether in a civil or criminal setting, is the notion that the defender is privileged to respond only to a reasonable belief on his part that he is in imminent danger of bodily harm. See Brown v. United States, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961 (1921); Josey v. United States, 77 U.S.App.D.C. 321, 135 F.2d 809, 810 (1943); 6 Am.Jur. 2d, Assault and Battery § 159. There is not an iota of evidence in the present record to support a jury finding that Frank acted in self-defense. Even if the jury believed that at some time prior to the attack Arthur had struck Frank, or that he had threatened to hit Frank in his "silver plate", nothing evidences that Frank acted at the moment of the attack with a reasonable fear of bodily harm. The defense witness Leroy Stevens' testified that after Arthur had struck Frank he returned to his work, and only then did Frank launch the attack. Frank himself never mentioned being struck, but instead testified that the two had argued "again, so I just hit him with the hook"; "I just got tired and hit him with the hook". All that a jury could find from this evidence is that Frank acted because he was greatly annoyed or frustrated by Arthur's actions. This is not self-defense.

■ It is settled that where the record does not support the submission of an issue to the jury it is reversible error to do so. Eichmann v. Dennis, 347 F.2d 978, 981 (3 Cir. 1965); Moore v. Smith, 343 F.2d 206, 210 (3 Cir. 1965); O'Neill v. Reading Company, 306 F.2d 204, 206 (3 Cir. 1962).

Second, as to the trial court's charge to the jury, "If the assault was * * * sufficiently provoked, the vessel was not unseaworthy".

The defendant urges on this point that (1) there was sufficient evidence of provocation to support a jury finding; (2) the plaintiff failed to furnish an adequate definition of provocation either in his points for charge, or when given the opportunity to do so at a side bar conference following delivery of the charge to the jury.

■ The defendant's first point is irrelevant. If the court failed to relate the evidence to an applicable legal standard the charge was erroneous, even if the evidence justified a finding of provocation under a proper charge. Cf. McNello v. John B. Kelly, Inc., 283 F.2d 96 (3 Cir. 1960).

The following colloquy between the court and plaintiff's counsel is relevant:

"Mr. Dorfman: Your Honor, I think you did not charge as to the meaning of the words 'provocation' and 'sufficient provocation', as I recall; and I would request a charge that provocation must be a sufficient provocation."

* * * * * *

"The Court: * * * Do you have a case there?

"Mr. Dorfman: Well?

"The Court: Well what?

"Mr. Dorfman: Mere words do not justify it at all.

"The Court: What words should I use then? Let the record indicate that you have not included anything in your points for charge. You are now asking me to put in words what is a provoked assault. What do you suggest? You tell me what words to use.

"Mr. Dorfman: The words I suggest, Your Honor, are that the provocation must be a sufficient provocation and that mere needling is not a legal provocation to justify Frank Smith's conduct.

"Mr. Thompson: I would object to that.

"The Court: Denied. Anything else?"

The standard of sufficient provocation for longshoremen and seamen differs from that applied to ordinary persons, Cf. Boudoin v. Lykes Bros. Steamship Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); Jones v. Lykes Bros. Steamship Co., Inc., supra, for they "lead a rough life and are more apt to use their fists than office employees", and "what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.'" Jones v. Lykes Bros. Steamship Co., Inc., supra, 204 F.2d at 817. In Walters v. Moore-McCormack Lines, Inc., supra, it was held that the trial court properly directed a verdict in favor of the defendant shipowner even though the record supported a possible finding that the plaintiff had been struck in the face with fists, hit with a "karate" blow, and furiously attacked after he fell to the deck, by a fellow seaman who was 30 pounds heavier than he, after they had exchanged some unpleasantries. But, nevertheless, there is a limit beyond which even seamen and longshoremen cannot go without their "disposition" being impugned. In Clevenger v. Star Fish & Oyster Company, Inc., supra, where the plaintiff was attacked by the ship's first mate, following an exchange of "seamen's unpleasantries," with a "devil's fork", a four foot long pointed steel ice chisel being used in unloading fish from the defendant's ship, the court held that the ship was unseaworthy as a matter of law. The factor which distinguishes Clevenger from Walters is the use in Clevenger of an unmistakably dangerous or deadly instrument, the "devil's fork", rather than mere fists. Thus, although it can be said that mere words may be sufficient provocation to signal the start of a longshoremen's brawl or fisticuffs, it is not enough when the means of attack is an unmistakably dangerous or deadly weapon.

A cargo hook, like a "devil's fork", when used as an instrument of attack is an unmistakably dangerous or deadly weapon. The court's charge, however, permitted the jury to find sufficient provocation for its use, even if they only found, for example, that Frank was motivated by the "argument of words" which the record indicates preceded the attack.

Absent some indication from the court that mere words could not serve as legal provocation for an attack with a cargo hook, the jury was without a sufficient guideline to render a proper decision on the question of provocation, and this was error. See McNello v. John B. Kelly, Inc., supra. Counsel's objections alerted the trial court to this deficiency in its charge.

Third, as to the trial court's charge to the jury:

"Was this a vicious, unprovoked, and unwarranted attack? The plaintiff says this is apparent by the use of a hook used by Frank Smith. However, I do think you should consider that they were both using the hook, admittedly everyday tools of their trade, and there is no testimony that Frank Smith went to get the hook to beat up the plaintiff. In other words, what I am trying to say is that I think you should take into consideration the fact that when this fight broke out they were both using hooks."

The viciousness of an attack may be established by a showing that the assailant used an unmistakably dangerous or deadly instrument. See Clevenger v. Star Fish & Oyster Company, Inc., supra; Walter v. Moore-McCormack Lines, Inc., supra; Jones v. Lykes Bros. Steamship Co., Inc., supra. The court's charge to the jury in the instant case, however, shifted the jury's focus from the dangerous nature of a cargo hook when used as a weapon, to the question of whether or not the hook was also a tool in everyday use in the trade. This shift in focus constituted error, for the fact that a hook is a tool normally used by longshoremen is irrelevant as is the fact that the assailant did not have to "get the hook to beat up the plaintiff".

Illustrative of this is the Clevenger case where the instrument of attack was a devil's fork, which was apparently being used to aid in the unloading of fish, an operation in which both the libellant and the assailant were engaged at the time of the attack.[1]

For the reasons stated the Judgment of the District Court entered November 26, 1963, pursuant to the jury's verdicts in favor of the plaintiff against the defendant and in favor of the defendant against the third-party defendant will be reversed with directions to grant a new trial in accordance with this opinion.

---

1. Connolly v. Farrell Lines, Inc., 268 F.2d 653 (1 Cir. 1959), relied on by the defendant and the third-party defendant, is distinguishable from the instant case. There, the instrument in question, a three foot plank, was held not to be an "unmistakably deadly weapon". Further, there was uncontradicted evidence that the attack was provoked.