Alvin E. HARBIN, Plaintiff-Appellee,

v.

The INTERLAKE STEAMSHIP COMPANY, Defendant-Appellant.

No. 76–1568.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1977.

Decided and Filed Jan. 27, 1978.

David G. Davies, David B. Hopkins, Arter & Hadden, Cleveland, Ohio, for defendant-appellant.

Lawrence E. Stewart, Stewart & Dechant Co., L. P. A., Cleveland, Ohio, for plaintiff-appellee.

Before WEICK and CELEBREZZE, Circuit Judges, and GRAY,* District Judge.

WEICK, Circuit Judge.

The plaintiff, Alvin E. Harbin (Harbin), a seaman, sued his employer, Interlake Steamship Company (Interlake), in the District Court, for damages in tort and for maintenance and cure under the Jones Act, 46 U.S.C. § 688, and the general maritime law. Jurisdiction was also invoked by reason of diversity of citizenship, 28 U.S.C. § 1332.

The tort was an alleged assault and battery committed upon plaintiff by another crewman, Alvin E. Highberg (Highberg), who was a second assistant engineer on board the steamer E. G. Grace, while the ship was in dock at Buffalo, New York.

In his complaint Harbin alleged negligence on the part of the ship's owner, Interlake, "in knowing and allowing Alvin High-

---

* The Honorable Frank Gray, Jr., Senior District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

berg to work as an officer on said ship despite his malicious and savage nature," and/or the unseaworthiness of the ship for the reason that Highberg "was an incompetent crew member by reason of his savage and vicious nature."

The case was tried before a jury. The District Court denied motions made by Interlake for a directed verdict at the close of plaintiff's evidence and at the close of all the evidence. The Court also denied Interlake's motion for a mistrial because of an alleged improper argument made by plaintiff's counsel to the jury. The Court submitted to the jury only the issue of unseaworthiness of the ship, and not any issue of negligence. The jury returned a verdict in favor of plaintiff in the amount of $10,000, and also answered special interrogatories as follows:

Interrogatory No. 1:

Did Alvin Highberg strike Alvin E. Harbin with a steel pipe during the course of the first altercation that occurred between the hours of 6:15 P.M. and 7:10 P.M. on the evening of December 11, 1973?

Answer: Yes

Interrogatory No. 2:

Was Alvin Highberg, the second assistant engineer, an officer not equal in disposition and seamanship to ordinary officers and men in his calling?

Answer: Yes

Interrogatory No. 3:

Did defendant's breach of its warranty of seaworthiness proximately cause or in any way contribute to injuries, if any, suffered by the plaintiff?

Answer: Yes

Interrogatory No. 4:

What sum of money do you find, if any, will fairly compensate plaintiff?

Answer: $10,000.00

The Court entered judgment on the verdict for $10,000 and costs, and also for $2,872 on the stipulated maintenance and cure count. We reverse the judgment on the verdict and affirm on the maintenance and cure count.

The facts of the case were very much in dispute. There was no dispute, however, about the fact that there were two assaults, rather than just one, committed during the evening of December 11, 1973. One was the assault which the jury found was committed by Highberg on Harbin between 6:15 and 7:10 p. m., and the other was an assault committed by Harbin on Highberg about two hours later. Harbin, in his testimony, admitted that just before he was assaulted by Highberg he had called Highberg a son-of-a-bitch. He testified, using only initials, that his words were: "You S.O.B., go to the engine room and leave me alone and I can take care of it or something, I could take care of it." Harbin also testified as to his later assault upon Highberg:

Q And at the time you were in the engine room at 10 o'clock did you and Mr. Highberg have a confrontation?

A Yes, sir. I told him I was going to take care of him.

The truth is that the evidence did not support the allegations of the complaint that Highberg was of "malicious and savage nature" and "was an incompetent crew member by reason of his savage and vicious nature." The uncontroverted evidence was to the effect that the time served by Highberg at sea was from twenty-five to twenty-six years, and that there had never been a complaint about his conduct. He had been licensed as a ship's officer by the United States Coast Guard for about twenty years, and had worked for Interlake for about three years. There was not an iota of evidence that he had a malicious, vicious and savage disposition. He was highly regarded by the men whom he supervised. He was never known to lose his temper or to raise his voice.

Harbin testified that he had been a seaman for twenty-five years, off and on. He did not say how much time was "off" or "on"; he had worked for Interlake less than two months. Harbin was 47 years of age, 6 feet 1 inch tall, and weighed 215 pounds. Highberg was nine years younger, was shorter, and weighed less.

There was no evidence of any prior enmity between Harbin and Highberg.

On the night of the incidents four crewmen were on watch duty: Highberg, the Second Assistant Engineer; Harbin, who was a fireman and was in charge of the operation of the boilers and stokers; an oiler, who was not a witness; and a wiper, Toivo Mikkola. All, except Highberg, were on duty from 4:00 to 8:00 p. m. Because another engineer had temporarily left the ship, Highberg was on duty from 6:00 p. m. to 12:00 midnight. The first two hours of Highberg's watch overlapped the last two of Harbin's watch, after which plaintiff would go off duty, and Highberg would then supervise another fireman, oiler and wiper. On the night of the alleged assault Highberg was the engineer of the watch, and Harbin was on duty in the fire room.

At approximately 7:00 p. m. Highberg was making a repair to the vessel, and shouted to Harbin to change the setting of a control in his area. The two men were separated by door-ways and a long distance, and Harbin did not understand the instructions. Highberg climbed down to Harbin's area.

Harbin testified that the following occurred: Highberg came down the ladder carrying a wrench and a pipe. Strong words ensued, and both men became angry. Harbin "cursed" Highberg and called him an "SOB". Then Harbin told Highberg to go back to the engine room and leave him alone, and turned his back, whereupon Highberg struck him on the hip with the pipe. Harbin fell to the floor, and was not attacked further. Then Highberg left.

Harbin testified that Highberg never did tell him what it was he wanted him [Harbin] to do, nor did Harbin assist further in making the repairs. Harbin stated that he had made no gestures or other physical provocation, and did not know that he was being attacked until the blow was struck.

Highberg, on the other hand, testified that the confrontation had been verbal only, and that he had carried no pipe when he went down to Harbin's area. He admitted that at the time in question he had nearly completed a double shift, which had been required because the ship was short-handed. He had been on duty twelve hours a day for the past seven days, and had had no days off for "a couple of" weeks.

The testimony is undisputed that at about ten o'clock the same evening a second confrontation occurred. Harbin returned to the engine room, swore at Highberg, made threats, and then struck Highberg in the face, knocking him down. After a struggle, Highberg upset Harbin onto his back, and the fight ended. Harbin was promptly discharged by Interlake for this attack on Highberg, yet Harbin told no one of the alleged first attack. He complained of a lacerated thumb, which Highberg had bitten when Harbin put his hand over Highberg's face. Harbin also had a lump on the back of his head where his head struck the floor in the second encounter. Harbin admitted that he had spent considerable time talking with his roommates during the time between the two confrontations, yet he had made no mention of having been hit by Highberg with a pipe.

Harbin's injuries consisted of a large hematoma on the left hip, spasms and pain in the lower back, and the lump on his head. There was testimony that the hip injury had been caused by a pipe-like instrument, and had triggered the lower back problems.

At no time during the period of Highberg's license by the United States Coast Guard had his license been revoked, nor had he been disciplined. His longtime shipmates testified that he was a man of unusually-even temper, and that he was highly regarded by his subordinates. Highberg's testimony was uncontradicted that he had not been involved in any physical violence since he "was a kid."

Highberg was asked the question, "[I]n your experience does [sic] the conduct of an officer aboard a Great Lakes steamship striking a crew member with an iron bar the normal disposition of the ordinary officer?" His answer was "No." Highberg was also asked whether he had been provoked by Harbin and his answer was "No."

On this evidence the question whether Interlake had breached its duty to provide Harbin a seaworthy vessel by employing an officer with a proclivity for assaulting people, was submitted to the jury.

It is now well settled that a ship owner owes to the seamen employed on its vessels an absolute, nondelegable duty to provide a seaworthy vessel. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); *Carlisle Packing Co. v. Sandanger*, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922). In *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955), the Supreme Court held that a ship can be unseaworthy by reason of defective personnel as well as by reason of defective gear or a leaky hull. The Court approved the formulation of *Keen v. Overseas Tankship Corp.*, 194 F.2d 515 (2d Cir.), *cert. denied*, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363 (1952), in which case Judge Learned Hand stated:

> The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling. [*Id.* at 518.] [Emphasis added.]

In *Boudoin* the plaintiff was attacked by a fellow crewman who, after a night's drinking, went to the plaintiff's room and took a bottle of brandy from under his bed. Plaintiff awoke, was startled, and the other crewman attacked him with the bottle, causing severe injuries. The District Court, in *Boudoin*, had found that shortly after the first assault, the assailant returned with a large knife, which he also intended to use on the plaintiff. The assailant continued to make threats and disturbances outside the sick bay, and episodes of drunkenness and disobedience continued for at least two days. On these facts the Supreme Court upheld the conclusion of the District Court that the ship owner had breached its warranty of seaworthiness, on the basis of its finding that the assailant was "a person of dangerous propensities and proclivities" at the time of the assault, and that he was "a person of violent character, belligerent disposition, excessive drinking habits, disposed to fighting and making threats and assaults." It held that "the District Court was justified in concluding that [the assailant] was not equal in disposition to the ordinary men of that calling and that the crew with [him] as a member was not competent to meet the contingencies of the voyage." 348 U.S. at 340, 75 S.Ct. at 385.

In setting up its standard for the decision in *Boudoin*, the Court noted that the warranty of seaworthiness did not make a ship owner liable for injuries "from all the fisticuffs on shipboard":

> The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? [348 U.S. at 339–40, 75 S.Ct. at 385.]

Thus it is plain that not every transitory occurrence of misbehavior on the part of a seaman can support a finding of a breach of the warranty of seaworthiness. To be actionable, a plaintiff's injuries must have been caused by the condition of the ship; to be material, an isolated act must be of such an aggravated character that it constitutes circumstantial evidence that during the time leading up to the assault, the ship was in an unseaworthy condition because of the presence of such an assailant. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). As the Supreme Court held in *Boudoin*, it is the "disposition" of the assailant, rather than simply the severity of the act, that is material to the issue of unseaworthiness. Quoting *Jones v. Lykes Bros. S.S. Co.*, 204 F.2d 815, 817 (2d Cir. 1953) (opinion of Judge Hand), the Court said:

All men are to some degree irascible . . . .. Sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is *not the measure of the "disposition" of "the ordinary men in the calling."*
[Emphasis added.]

The *Boudoin* Court, in affirming the judgment of the District Court on the facts before it, discussed the difference between an "assault within the usual and customary standards of the calling" and "a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature." The Court declined to intimate what extreme of conduct need be reached before liability for unseaworthiness arises, holding only: "We do think that there was sufficient evidence to justify the District Court in holding that [the assailant] had crossed the line, that he had such savage disposition as to endanger the others who worked on the ship." 348 U.S. at 340, 75 S.Ct. at 385.

 We are equally certain that in the present case that line has not been crossed.

In determining whether the defendant was entitled to a directed verdict, we have been bound to view the evidence in the light most favorable to plaintiff Harbin, and to give him the advantage of every fair and reasonable inference that the evidence may justify. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In answer to a special interrogatory, the jury found that Highberg had struck Harbin on the hip with a steel pipe during the course of their first altercation. This finding was supported by substantial evidence and we are therefore bound to accept it. It is uncontradicted that Harbin made no physical movements that would have provoked Highberg. Just before he was struck, however, Harbin did call Highberg a bad name. This is the sole evidence that Highberg had "such savage disposition as to endanger the others who worked on the ship," and we find it insufficient as a matter of law.

To believe that Highberg had such a savage disposition would require us to believe that it had been totally concealed during his twenty years as a licensed officer. In the alternative, we would be required to believe that his victims during that entire time had been so intimated that no complaint leading to disciplinary proceedings had ever been brought against him. Further, we would be required to believe that two seamen who testified under oath that Highberg was of even temper and that he was liked by all, did not tell the truth.

Further, we would have to disregard Harbin's own admissions against interest that he himself had provoked Highberg by "cursing" him and calling him an "SOB," and by being uncooperative and insubordinate. We would have to believe it was reasonable that this admitted provocation had no effect on Highberg.

Finally, we cannot accept as "savage" within the *Boudoin* standard, the blow itself. Although a steel pipe is potentially a dangerous weapon, the uncontroverted evidence showed that there was only a single blow to a nonvital part of the body, the side of the left hip in the vicinity of the pocket in a normal pair of men's trousers. This location is considerably removed from the head, which is the only target to which an assailant from behind could be assured of doing lethal harm.

As a matter of law, the evidence in this record does not support a finding of a savage disposition. Rather, it is well within the range of mere irascibility, which the courts have found might well lead to physical encounters between men at sea. We so hold, without the benefit of any formal findings of the normal frequency of violence on board ship; rather, we hold that the conduct complained of here does not constitute "a wicked disposition, a propensity to evil conduct, a savage and vicious nature," with which terms the *Boudoin* Court described the sort of person whose mere presence could render a ship unseaworthy.

We have omitted from our previous discussion any mention of two matters that might seem to bear on the case. First, the jury returned its answer to a special interrogatory, in which it found that Highberg was "an officer not equal in disposition and seamanship to ordinary officers and men in his calling." Second, Highberg himself testified, on examination by the plaintiff, that in his experience "the conduct of an officer aboard a Great Lakes steamship striking a crew member with an iron bar [was not] the normal disposition of the ordinary officer." He further testified that he was not provoked.

Initially, we point out that none of these statements is conclusive of the issue in the case. It is clear that the savagery concept, being specific, is the applicable test for a finding of unseaworthiness. It is plain that the intent of the *Boudoin* Court was to specify a high degree of viciousness as the standard of what constitutes abnormality.

As we have discussed, the answer to the special interrogatory was insufficient and did not determine the issue of savagery. Similarly, the testimony of Highberg is unsupported by any showing that he was aware of the legal conclusion as to which he was giving his opinion. There is also the question whether Highberg's employer, Interlake, is bound by Highberg's opinions as to legal matters which are within the province of a court to determine.

Further, the testimony was ambiguous, tending to equate conduct with a disposition. Certainly the act of striking a crew member is not normal conduct for a ship's officer; but we cannot discern in Highberg's testimony any intent to admit liability on the part of Interlake, or that the alleged assault constituted such a danger to others as to satisfy the *Boudoin* standard.

Our view of this case is squarely in accord with prior authority in the area. The *Boudoin* Court cited with approval Judge Hand's decision in *Jones v. Lykes Bros. S.S. Co.*, 204 F.2d 815 (2d Cir.), *cert. denied*, 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370 (1953). In that case an argument arose between the plaintiff and his assailant, remarkably similar to that concerned here. The assailant had no record of previous violence, and there was no prior enmity between him and the plaintiff. During the lengthy altercation, in which fists only were used, the plaintiff's hip was broken, and his assailant continued to pound him after he fell. On these facts the Court found insufficient evidence that the assailant was so savage as to be beyond the standards of the calling.

Accord, *Gulledge v. United States*, 474 F.2d 1340 (3d Cir. 1973), *aff'g*, 337 F.Supp. 1108 (E.D.Pa.1972); *Kirsch v. United States*, 450 F.2d 326 (9th Cir. 1971) (insufficient evidence of savage character where engineer, who committed unprovoked assault with fists over minor disagreement, had had five fights over thirty-year period); *Robinson v. S. S. Atlantic Starling*, 369 F.2d 69 (5th Cir. 1966), *cert. denied*, 386 U.S. 993, 87 S.Ct. 1309, 18 L.Ed.2d 339 (1967) (seaman who stabbed cruel, abusive captain properly found by District Court to be a "quiet, peaceful, efficient seaman"); *Connolly v. Farrell Lines, Inc.*, 268 F.2d 653 (1st Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 208, 4 L.Ed.2d 158 (1959) (insufficient evidence of unseaworthiness where seaman made threats of violence against plaintiff, and subsequently struck plaintiff in the head with three-foot board when plaintiff advanced on him); *Stankiewicz v. United Fruit S.S. Corp.*, 229 F.2d 580 (2d Cir. 1956). The fact that one of the seamen in the present case was a petty officer does not, in our judgment, call for the application of a different rule.

There is only one other issue which needs to be discussed because of the possibility of further appellate review and the necessity of our ruling on all issues in order that no remand need be made to our Court with respect thereto. That issue relates to the impropriety of the argument of plaintiff's counsel to the jury with respect to the good character of his client. Counsel had offered no proof as to such good character of his client and on his motion the Court had excluded evidence of his client's bad character, which evidence had been proffered by the defendant. The pertinent part of counsel's argument is appended hereto.

■ Plaintiff, in answer to defendant's interrogatories, admitted that he had been convicted of armed robbery in Detroit, Michigan, thirteen years earlier and was placed on probation; and that he had been convicted of a Dyer Act violation in the Federal District Court in Detroit fifteen years earlier, and had served eighteen months in the federal prison at Milan, Michigan. The District Court had excluded such evidence because of the lapse of more than ten years since conviction. Fed.R.Evid. 609. If, however, plaintiff had offered evidence as to his good character, then evidence of the old crimes, and even arrests, would have been admissible. Fed.R.Evid. 404, 405, 608, 609. *Cf. United States v. Wells*, 525 F.2d 974 (5th Cir. 1976).

■ The District Court also excluded evidence proffered as to plaintiff's chronic alcoholism, his tendency to become "pretty wild" when drinking, and his drinking on the evening of the incidents just before he committed an assault on Highberg.

Counsel for the plaintiff argued to the jury that his client was not a "bad guy," and that if he had been a "bad actor" defendant "would have brought witnesses from all over" to testify concerning plaintiff's "malevolent nature."

When plaintiff's counsel was making such argument counsel well knew that the defendant could not produce any such evidence because the Court, on counsel's motion, had forbidden the defendant from introducing the evidence as to prior crimes and other misconduct, which evidence defendant had actually procured and had proffered.

The District Court committed prejudicial error, in our opinion, in overruling objections to such argument of plaintiff's counsel, and in overruling defendant's motion for a mistrial. The permitting of such argument may have had some influence on the verdict which the jury returned.

Accordingly, the judgment on the maintenance and cure count is affirmed. The judgment of $10,000 damages for unseaworthiness is reversed and judgment is entered in favor of the defendant.

Each party shall pay his or its own costs.

The following excerpt is taken from the Appendix, pages 76–77:

I believe that there is no testimony in this case that Al Harbin is a bad guy. There is no one who has been called to say that he is a bad actor, a bad fellow. If he had been, or such evidence were available, Interlake would have brought witnesses from all over, as they have already done so, all over to testify concerning the malevolent nature of Al Harbin, that he is a bad egg.

Mr. Davies: Your Honor, I object.

The Court: Approach the bench.

[266] (Following proceedings had out of hearing of the jury.)

Mr. Davies: Such evidence would have been irrelevant, I don't believe it is proper argument.

(Reporter read back the last portion of argument.)

The Court: That is his interpretation.

Mr. Davies: Well, your Honor, insofar as felony convictions are concerned, so far as prior arrests are concerned, this would have been excluded, and I see no way any contrary evidence would have been admitted.

The Court: Overruled.

(Following proceedings had back in hearing of the jury.)

Mr. Stewart: There was no such evidence.

They, Interlake, brought before you Mr. Mikkola. And they took advantage of Mr. Mikkola's testimony, as you heard it from the witness stand, because it was just, according to Mr. Mikkola, a short point in time ago that he was asked to come and tell you or asked about the events involving [267] Mr. Highberg's activities with him on the night of this occurrence. You remember what he had to say.

Surely if they would bring Mr. Mikkola to tell you about that night's events on such short notice of requesting information from him when it is two some odd

years later, they would have brought other people to testify concerning Mr. Harbin.

Mr. Davies: Your Honor, may I make a statement on the record, please?

(Following proceedings had out of hearing of the jury.)

Mr. Davies: Your Honor, I move for a mistrial on the ground of improper argument.

The Court: What is the basis for it?

Mr. Davies: The same thing, your Honor. This would not be admissible had we brought it in.

(Reporter read back the last portion of argument.)

The Court: Overruled.