WILLARD NEWTON, Plaintiff-Appellee, *v.* FEDERAL BARGE LINES, INC., Defendant-Appellant.

Fifth District   No. 79-185

Opinion filed March 3, 1980.

· Gary Mayes and Dan H. Ball, both of Thompson & Mitchell, of East St. Louis, for appellant.

Mark Glass and David J. Letvin, both of Cohn, Carr, Korein, Kunin, Schlichter and Brennan, of East St. Louis, for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendant, Federal Barge Lines, Inc. (Federal) appeals from a judgment entered in favor of first mate Willard Newton for personal injuries allegedly caused by the unseaworthiness of Federal's towboat, M/V United States. The issues on appeal are: (1) whether the trial court erred in denying Federal's motion for judgment *n.o.v.*; (2) whether the trial court erred in excluding evidence of an incident involving plaintiff

and a cabin boy; and (3) whether the trial court erred in refusing an instruction tendered by Federal dealing with provocation as contributory negligence.

The head and neck injuries upon which this action was based were sustained by Newton in an attack upon him by a deckhand. Newton's complaint in the trial court asserted two theories of liability, negligence under the Jones Act (46 U.S.C. §688 (1970)) and unseaworthiness under general maritime law. The unseaworthiness claim was based on Federal's alleged act of employing "a person who was dangerous and vicious in disposition."

The cause was tried before a jury in the circuit court of Madison County, and at the close of plaintiff's case, Federal made a motion for a directed verdict. In the face of this motion, Newton withdrew his allegations of negligence, and the court denied the motion with respect to the claim of unseaworthiness. The jury returned a verdict in favor of Newton in the amount of $88,000. Federal's post-trial motion which sought in part a judgment *n.o.v.* was denied, and Federal brought this appeal.

The record reveals that on September 22, 1973, Federal's towboat, the M/V United States, was moving a tow of barges down the lower Mississippi River. Among its crew were Willard Newton and Jack Epps, both of whom were seamen of long standing. Newton, as first mate, was the person in charge of the United States' deck crew, and Epps was a deckhand under his supervision. Newton had continuously held the job of first mate with Federal since 1963 or 1964.

The deck crew of the M/V United States had three primary jobs: to manipulate the barges as necessary to add them to the tow or drop them off at their destinations; to maintain the coupling system which held the barges in a tight formation; and to keep the barges from taking on too much water.

The coupling system is checked four times a day at the beginning of each six hour shift. The coupling between barges consists of wires, cables and ratchets. The crewmen start from the towboat, which is pushing the tow, and work their way out, checking the couplings and tightening the wires and cables as necessary. Tightening is achieved by inserting an iron rod known as a "toothpick" into the end of the ratchet to hold the screws stationary, tightening the ratchet by hand and then tightening it a second time with the assistance of a "cheater bar" which is placed over the ratchet handle to provide additional leverage. A characteristic cheater bar is a steel or iron pipe, three feet in length and two inches in diameter. According to Newton and Epps, it weighs somewhere between eight and 15 pounds.

Newton testified that he and deckhands, Jack Epps and Frank Vaught, began checking the couplings at the start of the noon watch on September 22, 1973. A loose wire was found in the coupling of a leaking barge on the first line away from the boat. Epps asked Newton what he wanted done about it, and Newton told him to finish checking across the line and they would change the wire before moving on. While the deckhands were busy checking the other couplings, Newton made some adjustments to a pump that was operating on the damaged barge. He did not have any tools. When Newton looked up, he observed Epps moving on to the next row of barges. Newton shouted at Epps, asking him where he was going and telling him to come back.

Newton stated that as Epps approached him, he carried his cheater bar over his shoulder. Newton asked him why he had left the coupling when they were going to change the wire. Epps responded, "I ain't the God damn mate. I'm not supposed to know what to do." Plaintiff replied, "I am the God damn mate, and I told you what we was going to do before we left."

According to Newton, Epps was four feet away when this exchange was completed. Newton then saw Epps quickly reach for his cheater bar with his right hand. Believing he was going to be struck by Epps, Newton ducked but was struck anyway. Newton was rendered unconscious by the blow for several minutes, and when he came to he was bleeding profusely from a three inch gash on his head.

The record indicates that Epps immediately informed the towboat's captain, William Estes Wright, about the incident and was put ashore at his own request about one hour later. Around 7:30 p.m., the vessel reached Natchez, Mississippi, and Newton was taken to a hospital for treatment. His wound was sutured and his head was X rayed, revealing the presence of a two- or three-inch linear fracture. Newton did not return to work until eight months later and has experienced post-traumatic headaches and dizziness ever since.

The testimony of Jack Epps was presented by evidence deposition. On direct examination Epps stated that Newton had previously told him not to rehook the wire and tighten the ratchet on the leaking barge, but as he started out for the next row of couplings, Newton called him back and began using abusive and profane language towards him about the rigging. According to Epps, he became "sort of overheated" when Newton used this language and stepped back and swung the cheater bar like a baseball bat, hitting Newton in the head.

On cross-examination, Epps testified that when Newton cursed him he asked him to stop using such language. At that point, Newton stepped up close to Epps and Epps concluded from his facial expression and the

motion of his arms that Newton was going to slap him. Believing this to be the case, he struck Newton with the cheater bar. When asked to describe Newton's arm movements, Epps stated that Newton had not drawn back as if to throw a punch but "had his hands stretched out and behind him sort of, in a way." Epps corroborated that Newton had nothing in his hands when Epps struck him, and stated that this was the only time he had ever struck anyone with anything.

Epps also related that on a prior occasion, he had accidentally dropped Newton's suitcase into the river as Newton was going ashore, prompting Newton to yell at him in a profane manner.

In his testimony, Newton had stated that he did not recall any suitcase incident and did not hear Epps make any complaint about the strength of his language prior to the attack. Newton also denied drawing back his hand as if to slap Epps.

William Estes Wright, who was master of the M/V United States at the time of the incident, testified for Federal. He was well acquainted with Newton, having worked with him for approximately 150 days over a period of four or five years, but was not acquainted with Epps, the trip in September being their first together. According to Wright, Newton was a very aggressive man in his work who, like a lot of seamen, cursed profusely. Wright, however, had never observed Newton cursing a deckhand. Wright further characterized Newton as a little bullheaded and more aggressive than usual. Wright explained, however, that this type of mate is not particularly unusual in the calling and that some men apparently felt that such an attitude was necessary to get the job done. He did not know of any instance of Newton striking a deckhand working under him.

Wright also testified about a heated disagreement which he and Newton once had concerning how to extricate the towboat from a shoulder while dropping off barges. Wright stated that in a later discussion of the incident Wright informed Newton that navigation was up to him and Newton replied that he would get him out "on the hill" and change his mind about that. Apparently, to a seaman the expression to settle it up the hill means to have a fight off the boat. In his testimony, Newton denied that he had ever disagreed with Wright's instruction or invited him onto the bank to settle a difference of opinion.

■■ It is well settled under general maritime law that a ship owner owes to the seamen employed on its vessels an absolute, nondelegable duty to provide a seaworthy vessel. (*Harbin v. Interlake Steamship Co.* (6th Cir. 1978), 570 F.2d 99, *cert. denied* (1978), 437 U.S. 905, 57 L. Ed. 2d 1135, 98 S. Ct. 3091; *Seas Shipping Co. v. Sieracki* (1946), 328 U.S. 85, 90 L. Ed. 1099, 66 S. Ct. 872.) This warranty of seaworthiness is not limited to defects in a ship's construction or equipment; it is equally applicable to

the ship's crew. (*Boudoin v. Lykes Brothers Steamship Co.* (1955), 348 U.S. 336, 99 L. Ed. 354, 75 S. Ct. 382.) Consequently, in certain instances, a seaman injured by the assault of another has a cause of action against the owner for breach of warranty.

■■■ As applied to a seaman's temperament, the warranty of seaworthiness is that he is equal in disposition to the ordinary men in the calling. (*Kirsch v. United States* (9th Cir. 1971), 450 F.2d 326; *Keen v. Overseas Tankship Corp.* (2d Cir. 1952), 194 F.2d 515, *cert. denied* (1952), 343 U.S. 966, 96 L. Ed. 1363, 72 S. Ct. 1061.) The questions presented in an unseaworthiness claim based on an assault are whether the seaman's behavior was "within the usual and customary standards of the calling," or whether it was "a case of a seamen with a wicked disposition, a propensity to evil conduct, a savage and vicious nature." (*Kirsch v. United States* (9th Cir. 1971), 450 F.2d 326, 327; *Boudoin*, 348 U.S. 336, 340, 99 L. Ed. 354, 359, 75 S. Ct. 382, 385.) The mere presence of a seaman with such a disposition or nature renders the vessel unseaworthy, *Harbin v. Interlake Steamship Co.*

■■■ A claim that a vessel was unseaworthy because one's assailant was not equal in temperament and disposition to the ordinary men in the calling is susceptible to one of two modes of proof: (1) by independent evidence with regard to the assailant's temperament and disposition; or (2) by direct evidence showing a vicious and unprovoked attack. (*Smith v. Lauritzen* (3d Cir. 1966), 356 F.2d 171.) This second mode of proof, which was undoubtedly that pursued by Newton at trial, has also been described as proof of "an assault with a dangerous weapon." (*Walters v. Moore-McCormack Lines, Inc.* (2d Cir. 1962), 309 F.2d 191, 193; *Smith v. American Mail Line Ltd.* (W. D. Wash. 1973), 361 F. Supp. 1110, *aff'd* (9th Cir. 1975), 525 F.2d 1148.) Such an assault may be sufficient proof of a seaman's vicious temperament, in and of itself, since its aggravated character constitutes circumstantial evidence that during the time leading up to the assault the vessel was in an unseaworthy condition because of the presence of such an assailant. *Harbin v. Interlake Steamship Co.*

Federal's first argument on appeal is that the trial court should have entered a judgment *n.o.v.* since the attack was not sufficiently aggravated to support a finding of unseaworthiness. We disagree.

Although a cheater bar may not be as inherently dangerous a weapon as those employed in *Clevenger v. Star Fish & Oyster Co.* (5th Cir. 1963), 325 F.2d 397, and *Smith v. American Mail Line Ltd.*, when proper consideration is given to both the character of the bar and the manner in which Epps used it, we must find, as did the courts in *Clevenger* and *Smith*, that the attack was sufficiently aggravated in nature to support a finding of unseaworthiness.

■■ To say the least, Epps' instrument of attack was quite imposing. A

cheater bar is composed of hard metal and is approximately the same length as a baseball bat although it weighs more than four times as much. When such an instrument is swung like a bat so as to strike the unprotected head of a human, as Epps described his actions, the weapon undoubtedly becomes an extremely dangerous one. The language of the court in *Harbin v. Interlake Steamship Co.* (6th Cir. 1978), 570 F.2d 99, 104, lends support to this conclusion:

> "Although a steel pipe is potentially a dangerous weapon, the uncontroverted evidence showed that there was only a single blow to a nonvital part of the body, the side of the hip * * *. This location is considerably removed from the head, which is the only target to which as assailant from behind could be assured of doing lethal harm."

Further potent evidence of the aggravated nature of the attack is found in the severity of Newton's injuries and its long term residual effects. As is evident from our foregoing remarks, we do not find that it was error for the trial court to deny Federal's motion for entry of a judgment *n.o.v.* When the evidence relating to the nature of the attack is considered in its aspect most favorable to Newton, it cannot be said that it so overwhelmingly favors Federal that the present verdict cannot stand.

Federal's second contention on appeal is that the trial court erred in excluding a portion of Epps' evidentiary deposition relating to his observation of a verbal exchange between Newton and a cabin boy on September 21, 1973, in which Newton threatened to "slap the G.D. hell out of him" if he failed to again place a towel in Newton's shower stall. Although Epps never directly testified that this observation played any part in his decision to strike Newton with the cheater bar, Federal argues that this evidence was extremely relevant to their theories that Epps was acting in self-defense or was provoked into the attack by Newton.

■■ Even if we were to assume that Epps' testimony was sufficient to raise the issue of self-defense as well as provocation and that it was error to exclude this portion of Epps' testimony, we would not find the exclusion to be reversible error since the evidence was insufficient as a matter of law to establish self-defense or sufficient provocation to bring Epps' attack within the usual and customary standards of the calling.

■■ It is a principle so well established as to require no citation that a defender is privileged to respond with deadly force only when he harbors a reasonable belief that he is being threatened with imminent receipt of a like force. Such a reasonable belief is wholly lacking here. Epps conceded that Newton was unarmed, and, at most, his testimony showed that he believed he was going to be slapped by Newton. Under such circumstances, one is never justified in responding with deadly force.

We also find that evidence patently insufficient to establish adequate provocation to bring Epps' response within the usual and customary

standards of the calling. Epps testified that Newton directed profane language towards him and stretched his hands out behind him in such a manner as to cause Epps to believe he was going to slap him. These actions were simply insufficient provocation for Epps' brutal response. ■■ With respect to Newton's language the following statement from *Smith v. Lauritzen* (3d Cir. 1966), 356 F.2d 171, 177, demonstrates its insufficiency:

> "Thus, although it can be said that mere words may be sufficient provocation to signal the start of a longshoremen's brawl or fisticuffs, it is not enough when the means of attack is an unmistakebly dangerous or deadly weapon."

Nor can it be said that a gesture which threatens the delivery of a slap is sufficient to provoke a seaman to respond with a dangerous attack. Although it has often been stated that sailors may not be judged by the same standards as the general populace with respect to provocation for personal encounters by fisticuffs (see, *e.g., Boudoin v. Lykes Brothers Steamship Co.* (1955), 348 U.S. 336, 339, 99 L. Ed. 354, 358, 75 S. Ct. 382, 385), this rule cannot go so far as to justify Epps' actions under the facts of this case.

Federal's last contention on appeal is that the trial court erred in refusing to give the following non-IPI instruction, defendant's No. 3:

> "In considering the question of contributory negligence it is proper for you to take account of any provocation that you find that plaintiff offered to Jack Epps. If you consider that there was here a provocation and response of a sort commonly occurring on the river on tow boats then you may find for the defendant if you conclude that plaintiff's provocation was the sole cause of the blow Jack Epps struck. If you conclude plaintiff's provocation was contributory negligence on his part leading to the blow, then you must state in percentage terms the degree to which plaintiff's provocation, if any, contributed to the happeing [*sic*] of the episode."

After carefully considering the record, we cannot find that it was error for the trial court to refuse this instruction.

We would note first that a substantial portion of this instruction deals with whether there was adequate provocation for Epps' attack. Since we have already held that Newton's behavior, even if it was as described by Epps, was not sufficient provocation as a matter of law, the failure to give this portion of the instruction could not have prejudiced Federal. Consequently, if refusal of the instruction was error, it must be because of the portions relating to provocation as contributory negligence.

In its broadest terms, the question presented by an instruction such as this is: Can insufficient provocation ever be contributory negligence? Our research has provided no answer to this question. It is our opinion,

however, that this case does not require us to provide such an answer since there is absolutely no evidence in this case of contributory negligence on the part of Newton.

■■ As is stated in *Mroz v. Dravo Corp.* (3d Cir. 1970), 429 F.2d 1156, 1163, one is guilty of contributory negligence "[i]f * * * [he] by his own action subjects himself unnecessarily to [a] danger which should have been anticipated and is injured thereby." The evidence in this case demonstrates that the response of Epps was not one which should have been anticipated. Newton had no knowledge concerning Epps which should have led him to anticipate that Epps would attack one who cursed or threatened to slap him with a dangerous weapon. Epps himself testified that he had never struck anyone with anything before this. Moreover, Newton's use of strong language can hardly be considered negligent when the master of Federal's vessel acknowledged that cursing is quite common in the calling and often considered by mates to be necessary to get the job done. Considering these circumstances, we find that it was not error to refuse the proffered instruction.

For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.

Affirmed.

KARNS and KASSERMAN, JJ., concur.