**Linda Lavern CLABORN, as Personal Representative of Johnny Z. Claborn, Deceased, Plaintiff-Appellant,**

v.

**STAR FISH & OYSTER COMPANY, INC., a corporation, et al., Defendants-Appellees.**

No. 76–3710.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1978.

Rehearing Denied Oct. 6, 1978.

Richard F. Pate, Mobile, Ala., for plaintiff-appellant.

Robert H. Smith, Mobile, Ala., for defendants-appellees.

Before COLEMAN, AINSWORTH and VANCE, Circuit Judges.

AINSWORTH, Circuit Judge:

Linda Lavern Claborn brought this action to recover for the death of her husband, Johnny Z. Claborn, a deckhand on defendant's vessel the Dell G, who was stabbed to death by another crewman on September 15, 1973, during a fishing voyage off the Yucatán peninsula of Mexico. Plaintiff claims entitlement to recover damages for negligence under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness under general maritime law. The district court denied plaintiff's motion for a directed verdict, and the jury found for defendant. Plaintiff's motions for a new trial and for judgment notwithstanding the verdict were also denied, and she appealed. Finding that plaintiff has demonstrated unseaworthiness of the vessel as a matter of law, we reverse and remand for a determination of the appropriate damages.

The critical facts of this case are not in dispute. The Dell G left Mobile, Alabama on Tuesday, September 11, 1973. On board were the captain, Richard Kingsley, the first mate, James Browning, the cook, Atlee Stephenson, deckhands Bobby McCollough and Johnny Claborn, and several other crewmen. The depositions of Kingsley, Browning and Stephenson were received and read at trial. Browning stated that he and McCollough had been drinking during the four days before the vessel's departure. Captain Kingsley admitted that he brought six bottles of wine and two bottles of whiskey on board for the crew's consumption during the voyage. It was also shown that McCollough brought an additional fifth of whiskey on board.

The crew drank the six bottles of wine and one of the fifths of whiskey before the vessel left Mobile Bay. Thus, the only whiskey remaining on board was one bottle set aside by the captain for medicinal purposes and the fifth brought on by McCollough. The captain gave the "medicinal" fifth to the cook, who shared the bottle with Browning and McCollough, apparently at one sitting. McCollough's fifth was drunk after the vessel left Mobile Bay. Browning testified that he "sat and fed [the bottle of whiskey] to [McCollough]." Stephenson stated that he thought all the alcohol had been consumed by Thursday morning. Browning claimed that McCollough did not sleep during the voyage.

McCollough's drinking and his failure to sleep eventually took their toll. According to the captain, McCollough had to be handcuffed to the stern of the vessel on Friday evening.[1] Kingsley testified that McCollough was tied up for his own safety, because it was feared that he might fall overboard during an alcoholic convulsion. Kingsley insisted that McCollough did not behave in a violent manner while handcuffed to the stern, and that he had not heard of any threats made by McCollough. The first mate stated that McCollough was tied to the stern because he had been "[t]alking out of his head like he was going into the monkeys," and because McCollough had previously grabbed for a bait knife as if he was about to attack Claborn.[2] The cap-

1. Browning stated that McCollough was tied to the stern on Thursday afternoon and released on Thursday evening, in contrast to the captain's testimony that McCollough was tied up on Friday evening and released on Saturday morning.

2. Browning's testimony was as follows:
"Q Before the day of the stabbing, had McCollough been chained and handcuffed?
"A Yes.
"Q What was he eating?
"A He was eating beans.
"Q With his hands?
"A With his hands and he was shaking, you know.
"Q His hands were shaking real bad?

"A. Yes, he was watching the hatch cover up there. I am sitting opposite of him. Claborn and Bobby Dean was sitting side by side. Well, I cut this onion up and I laid the bait knife on the table. I said Bobby, go ahead and eat. He kept watching and kept watching. He said, see, they are talking about me now. Claborn spoke up, he said you know that Ted and I are your friend. He said we are not going to fuss with you. He said you are one of them. He reached and grabbed the bait knife.
"Q He was talking about—to Claborn then?
"A Yes, I put my hand on the knife. He didn't get it.
"Q Then, McCollough reached for the knife right when he was saying that?

tain admitted that he gave McCollough a half cup of wine while he was handcuffed to the stern, in order to relieve his shaking. McCollough had been released by Saturday morning, and took the wheel watch between 3 and 6 p. m. on Saturday. The first mate relieved McCollough at 6 p. m., and testified that at 7:20 p. m.[3] Claborn was standing next to him in the wheelhouse, and McCollough was sitting on the forward hatch. McCollough got up, walked back to the wheelhouse, and called for Claborn. Claborn turned around to face McCollough, cried out that McCollough had a knife, turned away and attempted to run. McCollough then stabbed Claborn in the back with a ten-inch bait knife. McCollough and Browning struggled, and Browning was cut in the neck. The cook and the captain finally subdued McCollough, and tied him to the mast. Claborn expired within minutes. Captain Kingsley stated that McCollough was delirious during the time he was chained to the mast.[4]

■ The crucial issue in this case is whether the Dell G was unseaworthy as a matter of law during the voyage. It is well settled that an especially dangerous seaman can cause a vessel to be unseaworthy. *See, e. g., Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 339, 75 S.Ct. 382, 384, 99 L.Ed. 354 (1955). *See generally* Benbow, *Seaworthiness & Seamen,* 9 Miami L.Q. 418, 425–26 (1955); Gilmore & Black, The Law of Admi-

ralty, 398–400 (2d ed. 1975); Norris, The Law of Maritime Personal Injuries § 308 (3d ed. 1975). As this court stated in *Clevenger v. Star Fish & Oyster Co.,* 5 Cir., 1963, 325 F.2d 397, 399: "[a] seaman . . who may be properly characterized as 'defective', because he fails to measure up to the standards of his calling, renders a ship as unseaworthy as a defective winch." The dangerous character of the seaman must be such that he is not equal in disposition to the ordinary men of that calling. *See Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354 (1955); *Keen v. Overseas Tankship Corp.,* 2 Cir., 1952, 194 F.2d 515, 518. The shipowner's lack of knowledge of a seaman's "defect" or dangerous condition is not an adequate defense. *See Clevenger v. Star Fish & Oyster Co.,* 5 Cir., 1963, 325 F.2d 397, 400. Thus, our role in reviewing this case is to determine whether, as a matter of law, McCollough failed to measure up to the standards of his calling.

In *Clevenger v. Star Fish & Oyster Co., supra,* we reversed the district court's decision in favor of the shipowner under the following circumstances. While unloading the catch, the first mate and libellant had "exchanged seamen's unpleasantries," *id.* at 398, and the first mate "without word or warning" stabbed Clevenger in the back with a "devil's fork," a four-foot-long ice chisel. *Id.* The district court had found

---

"A   He said you are one of them.
"Q   Then, you got the knife and didn't let him have it?
"A   He didn't get it then."

3.   The cook testified that the stabbing occurred at 6:40 p. m., and the captain estimated that the incident took place between 6 and 7 p. m.

4.   "Q   What did you do with . . . McCollough, after you got the knife away from him?
"A   We put the handcuffs on him.
"Q   Then what did you do with him?
"A   We took him out of the wheelhouse and tied him to the mast or the pin rail one.
"Q   Chained him to the rail?
"A   Yes, fastened him there. Because he was struggling then, trying—even with the handcuffs on, trying to get into the gurry pin (?) to get something out to fight with.
"Q   He was trying to get another weapon?
"A   Right.

"Q   Was he still struggling and fighting after you had him cuffed?
"A   Right.
"Q   How about after you got him chained to the mast?
"A   He was still hollering and struggling all night long that night and the next night, I guess—well, until we got into Isla Mujeres.
"Q   Is Isla Mujeres in Mexico?
"A   Yes, it is an island, there.
"Q   Was he still screaming and yelling?
"A   Yes.
"Q   Was he still delirious?
"A   I don't know whether it was delirium or incoherent talking, but, all kind of crazy things. I mean, all disconnected.
"Q   Did he appear to be in the DT's?
"A   I am not a doctor, I don't know what he was in.
"Q   It was just wild . . .
"A   Just wild, beserk."

that no unseaworthiness had been shown because the incident occurred during unloading rather than during the navigation or operation of the vessel, that the crew members were working as joint venturers, and that there was no evidence of negligence in the selection of the crew. We held that the district judge applied erroneous criteria in determining seaworthiness, and that the distinction between joint venturers and seamen was not relevant to the question of liability for unseaworthiness.

In *Clevenger* the court examined the standard of unseaworthiness caused by dangerous crewmen set forth in *Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955).[5] After canvassing the cases implementing the *Boudoin* standard, the court concluded that

[w]e extract from the cases the principle that in itself a savage assault with a meat cleaver or similarly dangerous weapon can be sufficient proof that the attacker is "not equal in disposition and seamanship to the ordinary men in the calling". Drunkenness and bellicosity are additional factors to consider when the nature of the assault is inconclusive evidence of the attacker's fitness in terms of his calling. *Id.* at 402.

Although the *Clevenger* decision stated that the issue of the fitness of the seaman was usually a question for the trier of fact, the court nevertheless squarely held that unseaworthiness had been demonstrated as a matter of law. Emphasis was placed by the court on the special savagery of the assault and the fact that the assailant was the commanding officer at the time the stabbing occurred.

In *Robinson v. S.S. Atlantic Starling,* 5 Cir., 1966, 369 F.2d 69, *cert. denied,* 386 U.S. 993, 87 S.Ct. 1309, 18 L.Ed.2d 339 (1967), this court applied the *Clevenger* principles to another shipboard stabbing. After extended mistreatment by the captain, the officers' messman stabbed him in the abdo-

men. The district court, sitting without a jury, concluded that the captain's abuse of the messman had precipitated the assault, and that the messman " 'was equal in disposition and seamanship to the ordinary men in the calling.' " *Id.* at 71. This court affirmed the district court's decision. *Clevenger* was not found controlling, and was distinguished as involving the application of erroneous criteria by the district court, an assault "of a much more shocking nature," no provocation, and an attack by a superior officer.

■ The present case is clearly distinguishable from *Robinson,* and well within the rationale of *Clevenger.* Here, the sudden attack with a ten-inch, very sharp bait knife was savage, and without warning or provocation. In contrast, the assault in *Robinson* did not demonstrate that the attacker was not equal in disposition and temperament to the ordinary sailor, largely because the abusive and tyrannical conduct of the victim provoked the stabbing. Nevertheless, the present case is unlike *Clevenger* in that it is not claimed that the district court applied erroneous criteria when it presented the issue of unseaworthiness to the jury, and further that the assailant was not in a position of command. These distinctions are without significant weight. First, the court in *Clevenger* did not only find that the district court applied erroneous criteria for unseaworthiness, but also held that under the facts of that case unseaworthiness was demonstrated as a matter of law. We agree with the reasoning in *Clevenger* that the command position of a seaman implies a higher standard of conduct. Nevertheless, even the lowest standards of ordinary seamen were not met by the assailant in this case. McCollough had been drinking for several days, had gone nearly a week without sleep, had previously grabbed for a bait knife with the apparent intent to stab Claborn, and had exhibited other delirious symptoms so that

5. In *Boudoin* the Supreme Court declared that:
[i]f the seaman has a savage and vicious nature, then the ship becomes a perilous place. A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member.

We do not intimate that [the assailant] is a maniac or that that extreme need be reached before liability for unseaworthiness arises. 348 U.S. 336, 340, 75 S.Ct. 382, 385.

his fellow crewman handcuffed him to the stern of the vessel. After stabbing Claborn, McCollough became "[j]ust wild, beserk." This was not an ordinary sailors' brawl.[6] On the contrary, the assault was unprovoked, sudden, extraordinarily savage, and fatal. We conclude that McCollough was not equal in disposition to the ordinary seaman, and that his presence aboard the Dell G made the vessel unseaworthy. Therefore, the district court should have granted plaintiff's motion for a directed verdict, since "the facts and inferences point so strongly and overwhelmingly in favor of [plaintiff] . . . that reasonable men could not arrive at a contrary verdict." *Boeing Company v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374.

As we have found for the plaintiff on the issue of unseaworthiness, we need not consider the question of maritime negligence, *see Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354 (1955); *Clevenger v. Star Fish & Oyster Co.,* 5 Cir., 1963, 325 F.2d 397, 402.

REVERSED AND REMANDED.

**6.** The Supreme Court in *Boudoin* recognized that shipowners are not "liable every time a seaman gets drunk and does damage to a member of the crew." Rather, "[t]he problem . . . is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature?" 348 U.S. at 339–40, 75 S.Ct. at 384–85. See also, Norris, The Law of Maritime Personal Injuries § 308, p. 27 (3d ed. 1975).