882 F.2d 976
 132 L.R.R.M. (BNA) 2481, 1990 A.M.C. 57,
58 USLW 2186,
58 USLW 2227, 113 Lab.Cas. P 11,554
 Mercedel W. MILES, Individually and as Administratrix of the
Succession of Ludwick Adam Torregano,
Plaintiff-Appellant, Cross-Appellee,
v.
Clifford A. MELROSE, et al., Defendants,
Apex Marine Corp., Westchester Marine Shipping Co., Inc.,
and Archon Marine Co., Defendants-Third Party
Plaintiffs-Appellees, Cross-Appellants.
AERON MARINE COMPANY, Defendant-Appellee,
v.
SEAFARERS INTERNATIONAL UNION, ATLANTIC, GULF, LAKES, AND
INLAND WATERS DISTRICT, AFL-CIO, Defendant-Third
Party Defendant-Appellee.
 No. 88-3325.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 11, 1989.
Rehearing and Rehearing En Banc Denied Oct. 11, 1989.
 
 Allain F. Hardin, New Orleans, La., for Mercedel W. Miles.
 Gerard T. Gelpi and Randall C. Coleman, III, New Orleans, La., for Apex Marine Corp., et al.
 William Lurve and Louis L. Robein, Jr., Metaririe, La., for Seafarers Intern. Union.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before RUBIN, POLITZ and JOHNSON, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 A mother seeks to recover for the death of her son, a steward's assistant on the defendants' vessel, who was stabbed to death by another crewmember. She contends she is entitled to damages for negligence under the Jones Act[1] and for unseaworthiness under the general maritime law. The defendants seek indemnity from the union, whose hiring hall had referred the assailant to the vessel, for its failure to warn the shipowner of the assailant's violent propensities. The district court dismissed the suit against the union for failure to state a claim. The jury found for the defendants on the unseaworthiness claim and for the plaintiff on the Jones Act claim.
 
 
 2
 Finding that the plaintiff has demonstrated unseaworthiness of the vessel as a matter of law, we reverse. We affirm the judgment finding the defendant negligent under the Jones Act, but find a complete absence of probative facts to support the jury's verdict that the victim contributed to his death, and therefore reverse the judgment on contributory negligence. In affirming the district court's determinations on the damages issues, we hold that under the general maritime law a seaman's estate may not recover for lost future earnings and nondependent parents may not recover for loss of society, even if the seaman was not survived by spouse or child. Finally, we reverse the dismissal of the duty-to-warn claim against the union and remand for its factual development.
 
 I.
 
 3
 In June 1984, Ludwick Torregano, a twenty-four year old seaman, was employed as a steward's assistant on board the vessel M/V ARCHON on its maiden voyage from Korea to Portland, Oregon. The vessel was owned by the Aeron Marine Company, bare-boat chartered to Archon Marine Corporation, and operated by Apex Marine Corporation and Westchester Marine Shipping Company, Inc. (collectively "the defendants" or "Apex"). The seamen were hired pursuant to a collective bargaining agreement between Apex and the Seafarers International Union, Atlantic, Gulf, Lakes and Inland Waters District, AFL-CIO ("the union").
 
 
 4
 Torregano was the lowest-ranking member in a three-person galley department, along with James Jackson, the chief steward/baker, and the chief cook, who left the vessel in Portland and was replaced by Clifford Melrose on July 5. Joseph A. Acquarone, the captain of the vessel, testified that soon after Melrose signed on he expressed his dissatisfaction with the working conditions aboard the vessel and repeatedly asked to be released. On July 18 at 5:20 in the afternoon, the captain told Melrose that he had been replaced and would be put off at the next port of call. Jackson stated that around 6:30 that same day, Melrose provoked an argument with him, in which Melrose accused him of being a weak steward, being too permissive with Torregano, and complained about Torregano's and Jackson's work. Jackson thought Melrose was hostile, argumentative, angry, and under the influence of alcohol.
 
 
 5
 Less than a hour later, Jackson went to Torregano's room and found him on the floor lying in a pool of blood. Blood was spattered on the walls and furniture. Jackson went to inform the Captain that Torregano had been killed, and both men returned to the room. Outside in the hallway, Jackson saw Melrose standing naked and wet, with a blood-stained towel wrapped around his arm.
 
 
 6
 The coroner's report established that Torregano had been stabbed or cut at least 62 times and had died of stab wounds to the chest and heart. Tests showed a negligible amount of alcohol in his system and no trace of drugs. The night of the murder, Melrose had a .19gm% level of blood alcohol. A jury in Clark County, Washington, convicted Melrose of second degree murder.
 
 
 7
 Mercedel Miles, Torregano's mother and administratrix of his estate, sued the defendants under the Jones Act and the general maritime law. She also sued Melrose, but he was outside the jurisdiction of the district court and could not be served. Miles amended her complaint to add a claim against the union and the defendants filed a third party complaint against the union. The district court dismissed those actions for failure to state a claim. Joseph O. Torregano, the victim's father, sued the defendants for loss of society under the general maritime law.
 
 
 8
 At the close of the plaintiffs' case at trial, the court granted the defendants' motion to strike the claim for punitive damages and the claim of Joseph O. Torregano for loss of society. At the end of defendants' case, the court denied plaintiffs' motion for a directed verdict on the unseaworthiness and Jones Act negligence claims.
 
 
 9
 The jury found that (1) the defendants were negligent and Torregano was 7% contributorily negligent in causing Torregano's death; (2) the M/V ARCHON was not unseaworthy; (3) the estate should be compensated $140,000 for the pain and suffering of Torregano prior to his death; (4) Miles should be compensated $7,800 for the loss of support and services of her son; (5) Joseph Torregano is not entitled to recover damages for his loss of services from his son; and (6) Miles was not financially dependent upon Torregano and accordingly not entitled to damages for loss of society. The court denied both parties' motions for judgment notwithstanding the verdict.
 
 II.
 
 10
 Miles contends that the district court should have entered a judgment that the vessel was unseaworthy as a matter of law notwithstanding the jury's contrary verdict. A ship is unseaworthy unless it and all of its appurtenances and crew are reasonably fit and safe for their intended purpose.[2] The shipowner has an absolute duty to provide the members of his crew with such a seaworthy vessel, an obligation not dependent on fault.[3] Just as a dangerous mast, a defective line, or a damaged hull may render a vessel unseaworthy, so may a seaman who is not reasonably fit.[4] To establish such unseaworthiness, a plaintiff must prove that the crewmember was not "equal in disposition and seamanship to the ordinary men in the calling."[5] Under this standard a crew member who participates in an "ordinary sailors' brawl" is not per se unfit;[6] the rigors of work at sea for long periods of time in the close confines of a vessel may lead not only to quarrels but to physical challenges. As Judge Learned Hand explained, "Sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.' "[7] A seaman is not unfit merely because he is irascible; he fails to meet the seaworthy standard only if he posseses a savage and vicious nature.[8]
 
 
 11
 A crew member's malevolence may be proved by independent evidence with regard to his disposition or by direct evidence showing that he launched a vicious and unprovoked attack.[9] Because what constitutes fitness is largely a fact-specific inquiry, courts rarely determine whether as a matter of law the temperament of a seaman renders a vessel unseaworthy. This court, however, has done so in cases involving an extremely violent assault. In Clevenger v. Star Fish & Oyster Company,[10] the first mate stabbed a fellow seaman in the back with a four-foot-long ice chisel following an exchange of "unpleasantries." The court reasoned,
 
 
 12
 We extract from the cases the principle that in itself a savage assault with a meat cleaver or similarly dangerous weapon can be sufficient proof that the attacker is "not equal in disposition and seamanship to the ordinary men in the calling." Drunkenness and bellicosity are additional factors to consider when the nature of the assault is inconclusive evidence of the attacker's fitness in terms of his calling.[11]
 
 
 13
 Similarly, in Claborn v. Star Fish & Oyster Company,[12] we found unseaworthiness as a matter of law when one crewmember stabbed another to death in an assault that was "unprovoked, sudden, extraordinarily savage, and fatal."[13]
 
 
 14
 The evidence of the nature of the assault here leaves no doubt that Melrose had an extraordinarily violent disposition. He did not merely exchange blows with Torregano or fail to follow the Marquis of Queensberry's rules. Melrose inflicted 62 knife wounds on Torregano: 12 cutting and stabbing wounds to the face, neck, and scalp; 29 stab wounds to the front and back of his chest and abdomen; and 21 wounds to his extremities. The coroner testified that the wounds on Torregano's arms were defense wounds, caused by an instinctive reaction to escape injury, characteristic of an effort to put up his hands to ward off the knife. Because some of the wounds were concentrated in one area on Torregano's back, the coroner concluded that they had been inflicted at some point when Torregano was immobilized and unable to defend himself. The coroner explained, "the nature of these wounds is sort of what I refer to as a stabbing frenzy, when [Torregano] was simply down, incapacitated and multiple stab wounds are inflicted in rapid succession in the same general area." Since no evidence contradicts the coroner's version, we conclude that, like the assailant in Claborn, Melrose appears to have gone "[j]ust wild, beserk [sic]."[14] This uncontroverted evidence, fully supported by the physical facts, is sufficient to establish as a matter of law that Melrose was an especially violent seaman not up to the standard of the calling.
 
 
 15
 The defendants contend, however, that there is a factual question whether Torregano provoked or initiated the attack that bars finding unseaworthiness as a matter of law. We disagree. Construed most favorably to the defendants, the evidence that Torregano attacked Melrose is negligible. It is the fact that Melrose was found with a blood-stained towel wrapped around his arm and a union official's hearsay statement that the company agent told him Melrose was cut on his hands. There is no direct evidence that Melrose had suffered any injury, let alone one inflicted by Torregano, or that the blood stains were aught but Torregano's. Indeed the evidence presented supports the conclusion that Melrose was the initial aggressor. Torregano was killed in his own room. Jackson testified that Melrose argued with him less than an hour before Torregano's death about the victim's inadequate work. Jackson also testified that he thought Melrose had been drinking and was very hostile and out of control.
 
 
 16
 Relying on the description in Claborn that the assailant attacked his victim "without warning or provocation,"[15] and to the similar language in Clevenger that the attack was "without word or warning,"[16] the defendants argue that the plaintiffs must prove that the attack was unprovoked. The test of unseaworthiness, however, is whether the assailant is equal in disposition and seamanship to the ordinary men in the calling. That the attack was unprovoked or sudden are factors to be considered in making that determination, but they are not the test itself.
 
 
 17
 Thus, even if Torregano had initiated the attack by cutting Melrose's arm, the question remains whether Melrose's response was proportionate with the provocation in any degree. Was the response one of an ordinary seaman or one of a person with vicious propensities? Melrose weighed between 75 and 100 pounds more than his victim. Torregano suffered more than 20 wounds on his arms while fending off the attack and multiple stab wounds to his back while he was "in some way immobilized, perhaps unconscious." This evidence suggests that Melrose had control of or completely subdued Torregano throughout the struggle.
 
 
 18
 Moreover, in cases, undoubtedly frequent, when there are no witnesses to an attack, the defendant cannot merely rely on an injury to defeat a finding of unseaworthiness as a matter of law. In a violent struggle in which the victim fights for his life, it is not unusual for the assailant to suffer some injury as well. There is no evidence concerning how or when Melrose was cut. The alleged laceration might have been caused by the victim's fingernails or a sharp object he grabbed during the struggle. It might have been inflicted by Melrose himself during his wild stabbing episode. It would be rare indeed for the assailant to escape completely unscarred from such a violent and prolonged struggle. To allow such slim and speculative evidence of provocation to defeat a finding of unseaworthiness as a matter of law would bar such a determination in cases involving the most egregious and violent incidents. We refuse to hold that a finding of unseaworthiness as a matter of law may exist only in cases in which an eyewitness can verify the lack of provocation. Instead, we reaffirm the holding of Clevenger that "in itself a savage assault with a meat cleaver or similarly dangerous weapon can be sufficient proof that the attacker is 'not equal in disposition and seamanship to the ordinary men in the calling.' "[17]
 
 
 19
 The savagery of the attack itself leads us to conclude that Melrose had an especially dangerous disposition. As a matter of law, Melrose failed to measure up to the standard of his calling and rendered the vessel unseaworthy. The district court erred in not entering a judgment notwithstanding the verdict on unseaworthiness, since "the facts and inferences point so strongly and overwhelmingly in favor of [plaintiff] ... that reasonable men could not arrive at a contrary verdict."[18]
 
 III.
 
 20
 The shipowner claims the court erred in denying its motion for a directed verdict on the issue of Jones Act negligence. Ordinarily when we have found for the plaintiff on the issue of unseaworthiness, we need not consider the question of Jones Act negligence.[19] However, since Miles rests her claim for punitive damages in part on the Jones Act, we address the issue.
 
 
 21
 The standard of review for the sufficiency of the evidence to establish claims arising under the Jones Act is less exacting than that for general maritime law claims. The evidence suffices unless there is a "complete absence of probative facts" to support the non-movant's position.[20]
 
 
 22
 "Establishing shipowner negligence in assault cases normally requires evidence supporting either of the following propositions: 1) that the assault was committed by the plaintiff's superior for the benefit of the ship's business, or 2) that the master or ship's officers failed to prevent the assault when it was foreseeable."[21] A seaman in a Jones Act case has only a "featherweight" burden of proof; he need prove only slight negligence, "which can be accomplished by very little evidence."[22]
 
 
 23
 Since there is no evidence that Melrose was acting for the benefit of the ship's business, only the second basis for negligence is tenable. We therefore reject Miles' contention that "the negligent actions of Melrose himself in becoming intoxicated and losing control" is sufficient evidence on which to find the vessel negligent. Miles points to other evidence, however, that does address the failure of the officers to prevent a foreseeable assault: (1) Jackson, the chief steward, knew Melrose was hostile, argumentative, and "on something" immediately prior to the assault on Torregano; (2) Jackson knew Melrose was belligerent and argumentative when he drank yet allowed him to do so; and (3) Jackson allowed drinking on board the vessel despite the ship board rule prohibiting it. Given the slight burden of proof, we find Jackson's testimony sufficient evidence to create a question for the jury whether Apex was negligent. We therefore uphold the district court's denial of judgment notwithstanding the verdict on the issue of the defendants' negligence under the Jones Act.
 
 IV.
 
 24
 Miles contends that the evidence is insufficient to support the jury's verdict that Torregano was 7% contributorily negligent for the assault. Comparative negligence applies in both Jones Act and unseaworthiness actions, barring an injured party from recovering for the damages sustained as a result of his own fault.[23] The defendant has the burden of proving that the plaintiff was contributorily negligent and that such negligence was the proximate cause in producing his injury.
 
 
 25
 The special interrogatories to the jury did not specifically assign the contributory-negligence finding made to the negligence claim or the unseaworthiness claim. When injuries stem from a single accident or event, it is not inappropriate to submit a single interrogatory concerning the amount of damages. We apply different standards of review, however, to Jones Act claims and general maritime law claims in deciding whether the evidence was sufficient to submit the case to the jury and whether, as a matter of law, the evidence would support the jury's verdict. For claims arising under general maritime law we apply the "reasonable minds" standard. For sufficiency claims arising under the Jones Act, we apply the stricter "complete absence of probative facts" standard whether we are reviewing findings regarding a defendant's or plaintiff's negligence.[24]
 
 
 26
 The defendants' theory of contributory negligence relies on the same evidence as their theory that Torregano provoked the attack: primarily the testimony that there was a blood-soaked towel on Melrose's arm, creating the inference that Melrose had been cut by Torregano. For the reasons already given in rejecting the provocation argument, and given the defendants' burden of proving contributory negligence, the evidence that Torregano initiated the altercation by cutting Melrose is not sufficient to support the jury's finding that Torregano was 7% contributorily negligent for his death. Considering the savagery of the assault, the complete absence of any evidence that the victim acted aggressively toward the assailant or anyone else, and the testimony that the assailant was under the influence of alcohol, hostile, angry, and complaining about the victim just prior to the attack, the mere fact that Melrose might have had a cut on his arm, if indeed he did, without more, is insufficient evidence of contributory negligence, even under the stricter "complete absence of probative facts" standard. The district court erred in not directing a verdict or granting Miles' motion for a judgment notwithstanding the verdict on this issue.
 
 V.
 
 27
 The defendants' also contend that the evidence was insufficient to support the jury's verdict that Torregano experienced conscious pain and suffering before he died. We find the coroner's testimony sufficient to create a factual issue on this point. Although he could not establish when Torregano lost consciousness, the coroner testified that the configuration of Torregano's wounds suggests that he was conscious for some time during the attack, because the slashing and cutting wounds on Torregano's face and arms are characteristic of the "instinctive reaction of someone to ward off an implement." From this the jury could infer that the victim experienced post-impact pain and suffering. Direct evidence is not required.[25] We therefore affirm the district court's denial of defendants' motion for judgment notwithstanding the verdict on this issue.
 
 VI.
 
 28
 Having found the M/V ARCHON unseaworthy as a matter of law, we confront two questions of first impression for this circuit concerning the proper scope of damages under the general maritime law. May the deceased's estate bring a survival action for the recovery of the victim's future economic loss? In a wrongful death action, may the nondependent parents of a deceased seaman, survived by neither spouse nor child, recover for loss of society?
 
 A.
 
 29
 Torregano's estate seeks to recover the earnings that would, but for his death, have been income to him during his life expectancy. Apex first asserts that this issue cannot be raised on appeal because Miles did not sue on behalf of the estate, and because the claim for future losses was not raised in the trial court. Both contentions are incorrect. Miles appeared in her initial pleading "individually and in her capacity as administratrix of the succession of Ludwick A. Torregano." On the third day of trial, she raised the issue whether the estate is entitled to recover the future economic loss of the decedent. Since the district court held that the Fifth Circuit does not allow such damages, the merits of the issue are properly before us.
 
 
 30
 In a survival action, the estate or successors of a deceased person are allowed to prosecute a claim for personal injury that the deceased himself would have had but for his death. In a wrongful death action, the victim's dependents, not the victim, are allowed to recover for the harms they personally suffered as a result of the death, independent of any action the decedent may have had for his own personal injuries. Neither cause of action was permitted at common law, which followed the rule that personal tort actions died with the plaintiff.[26]
 
 
 31
 Until the Supreme Court's decision almost twenty years ago in Moragne v. States Marine Lines, Inc.,[27] the general maritime law followed the common law rule barring survival and wrongful death actions. In Moragne, the Supreme Court recognized a wrongful death action for negligence and unseaworthiness under the general maritime law. The Court, noting that every state and many federal statutes included wrongful death provisions, concluded that such actions have become part of our general law.[28] In recognizing the action, the Court stated that the general maritime law would be guided, but not bound, by the wrongful death statutes already in force. It explained, "If ... subsidiary issues should require resolution, such as particular questions of the measure of damages, the courts will not be without persuasive analogy for guidance. Both the Death on the High Seas Act and the numerous state wrongful death statutes have been implemented with success for decades."[29]
 
 
 32
 The Supreme Court has not yet recognized a cause of action for survival benefits under general maritime law; Moragne and subsequent cases considered by the Court involved wrongful death benefits. After Moragne, however, numerous decisions of this and other circuits have recognized that, under the principles announced in that decision, the general maritime law includes a survival action permitting recovery for the victim's pre-death pain and suffering.[30] Following the rationale of Moragne, which looked to the proliferation of state wrongful death acts to find that such an action had become part of our general law, courts reasoned that a survival action for pain and suffering should be recognized as well, since the Jones Act and almost all states allow such survival actions.[31]
 
 
 33
 Torregano's estate contends that the general maritime law should also recognize a survival action for the decedent's lost future income. In Evich v. Morris,[32] the Ninth Circuit allowed an estate to bring such an action when there were no dependents. The court acknowledged that the Jones Act and the majority of states do not allow future economic loss to be recovered in survival actions. Nevertheless, it held:
 
 
 34
 [W]e find recovery here " 'better becomes the humane and liberal character of proceedings in admiralty' ", Moragne, 398 U.S. at 378, 90 S.Ct. at 1780 (citation omitted), and prevents the anomaly of rewarding a petitioner for killing his victim rather than injuring him, see id. at 395, 90 S.Ct. at 1784. Most states and the Jones Act allow these damages to be recovered in the form of loss of support when wrongful death beneficiaries exist. Where, as here, those beneficiaries do not exist, potential problems with double recovery do not exist. Under these circumstances the decedent's estate should be compensated for loss of future earnings. See Kriesak v. Crowe, 36 F.Supp. 127, 129 (M.D.Pa.1940).[33]
 
 
 35
 We are not persuaded that the reasons advanced in Evich support recognizing an additional basis for recovery. While the liberality of admiralty proceedings informs the development of maritime jurisprudence, it does not license courts to create causes of action whenever they see fit. Moragne did not recognize a maritime cause of action for wrongful death merely because it was humane to do so. Rather, it recognized the wrongful death action within the context of an almost universal rejection of the common law rule barring such actions.[34] Furthermore, in its reference to a dependent's recovery for support under wrongful death statutes and the Jones Act, Evich erroneously equates a policy of supporting dependents with one of making an estate whole for the loss of future earning capacity.
 
 
 36
 The Court in Moragne was strongly influenced by the fact that the Jones Act, the Death on the High Seas Act (DOHSA), and every state had departed from the harshness of the common-law rule and enacted wrongful death provisions. It explained: "This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law."[35] In contrast, most state survival statutes and the Jones Act do not allow recovery for lost wages.[36] DOHSA gives no action for any kind of survivorship benefit. The recognition of an estate's survival action for lost wages would stand alone in admiralty law in contrast to the prevalence of wrongful death statutes that informed the decision in Moragne. Furthermore, since Jones Act survival claims do not extend to the decedent's lost wages,[37] uniformity of maritime law is not served by allowing such an action under the general maritime law. We conclude that the general maritime law does not permit a survival action for the deceased's lost future wages.
 
 B.
 
 37
 Miles contends that in a wrongful death action under the general maritime law the nondependent parents of a deceased seaman may recover for loss of society when there is no surviving spouse or child. She asserts the claim on behalf of herself as mother and Joseph Torregano as father; however, since Torregano has not filed a notice of appeal, we have jurisdiction to hear only Miles' claim.[38]
 
 
 38
 Moragne left open the question whether a wrongful death action under general maritime law would permit recovery beyond the pecuniary-damages-only limits of the Jones Act and DOHSA. In Sea-Land Services, Inc. v. Gaudet,[39] the Court held that the surviving spouse could, in addition to recovering pecuniary damages, be compensated for loss of society, that "broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection."[40] Since the policy underlying the remedy in Moragne is "to insure compensation of the dependents for their losses resulting from the decedent's death,"[41] the Court concluded that a decedent's dependents may recover damages for their loss of support, services, and society.[42]
 
 
 39
 Miles suggests that in Skidmore v. Grueninger[43] we allowed a nondependent adult daughter to recover for loss of society. This is in error. We agree with Judge Carr's careful analysis in a recent district court opinion[44] that, although in Skidmore we did not address the issue whether the decedent's 19 year old daughter had been dependent on the decedent, the district court in that case explicitly found that she was. Thus the issue raised here, whether nondependents may recover for loss of society when there is no surviving spouse or child, is one of first impression for this circuit.
 
 
 40
 In Sistrunk v. Circle Bar Drilling Company,[45] we held that nondependent parents of a seaman killed in territorial waters who was survived by a spouse or child could not recover for loss of society. Our analysis in Sistrunk primarily relied on the twin aims of maritime law that informed the creation of the wrongful death action in Moragne: achieving uniformity in the exercise of admiralty jurisdiction and providing special solicitude to seamen. We concluded that "denial of recovery lends more uniformity to admiralty jurisdiction than allowing recovery," because the parents could not recover loss-of-society damages under either the DOHSA or the Jones Act.[46] The same is true of those relatives of a seaman who is not survived by a spouse or children, since DOHSA limits recovery to pecuniary losses[47] and the survivors cannot recover for loss of society under the Jones Act.[48] Sistrunk concluded that the second aim of maritime law, providing for the special solicitude of seamen, would not be furthered in any meaningful way by allowing nondependent parents to recover for loss of society. We explained:
 
 
 41
 To the extent that the purpose of admiralty's special solicitude to the survivors of seamen is to provide for their financial support, the special solicitude aim of admiralty has no relevance in this case. The parents in this case were not dependent on their sons.
 
 
 42
 If a purpose of the solicitude is to provide the survivors peace of mind both before a seaman undertakes to venture upon hazardous and unpredictable sea voyages and after the death of the seaman, admiralty's special solicitude does not automatically mean that the parents in this case should recover. As stated above, the parents could not recover if the seamen's deaths occurred on the high seas or were the result of negligence but not of unseaworthiness. Admiralty cannot provide the parents solicitude at a voyage's outset when their right to recover for loss of society is dependent on the fortuity that the deaths occur in territorial waters and are caused by unseaworthiness. Similarly, the parents have not explained why this court should extend to them special solicitude when, but for the happenstance that the seamen were killed in territorial waters and by unseaworthiness, Congress would have denied them recovery under DOHSA and the Jones Act.[49]
 
 
 43
 Since the parents here were also not dependent on their son and since they too could not recover these damages under the Jones Act or DOHSA, we do not contravene maritime law's aim of providing special solicitude to seamen by denying them recovery for loss of society.
 
 
 44
 The final factor considered in Sistrunk, the extent to which maritime law and state wrongful death actions allow nondependent parents of a deceased seaman with a spouse or offspring to recover for loss of society, also counsels against allowing such recovery here. As already discussed, Miles cannot recover for loss of society under the Jones Act or DOHSA. State wrongful death statutes take a variety of approaches to whether nondependent parents may recover for loss of society: some deny recovery for all non-pecuniary injuries,[50] some deny recovery for all loss of society claims,[51] and some allow recovery for loss of society, but only for that of minor children.[52] Thus, unlike the wrongful death statutes relied on in Moragne, the statutory provisions concerning recovery for loss of society by nondependent parents of a decedent survived by neither spouse nor child are without pattern.
 
 
 45
 Since loss of society is not a financial loss, restricting its recovery to dependents may seem unwarranted. However, tort law has never recognized a principle of awarding redress to all who are injured by an event, however wide the ripple. Strict liability, such as that for unseaworthiness, is based in part on the assumption that the defendant is best able to bear and distribute the cost of the risk of injury. But there are limits to a defendant's power to shift losses to the public. The larger and more amorphous the potential class of plaintiffs, the more difficult it is to estimate and insure against the risk in advance, weakening the justification for imposing liability.[53] The number of plaintiffs who could allege a loss of love and affection as a result of the death of a dearly beloved seaman--aunts and uncles, nieces and nephews, even friends and lovers--necessitates that we draw a line between those who may recover for loss of society and those who may not. The line suggested by the Supreme Court in Moragne and Gaudet, and by our own court in Sistrunk, the line between dependents and nondependents, "appears to be the most rational, efficient and fair."[54] It creates a finite, determinable class of beneficiaries. It allows recovery for those with whom the creation of the wrongful death action was concerned: a seaman's dependents. We therefore hold that in a general maritime wrongful death action nondependent parents may not recover for loss of society whether or not their deceased children were survived by spouse or child.
 
 VII.
 
 46
 After the close of the plaintiffs' case, the district court dismissed their claim for punitive damages. Miles contends that she produced sufficient evidence to raise a jury issue regarding punitive damages under the general maritime law.
 
 
 47
 Punitive damages are recoverable under the general maritime law "upon a showing of willful and wanton misconduct by the shipowner" in failing to provide a seaworthy vessel.[55] Because punitive damages are designed to punish the wrongdoer, more than simple negligence is required. The defendant must have been guilty of " 'gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct.' "[56]
 
 
 48
 Miles contends that a jury issue is raised regarding punitive damages by the evidence that Jackson, the ship's chief steward, permitted Melrose to drink alcohol on board, despite the ship's prohibition against it and Jackson's knowledge that Melrose became more violent when he drank. In order to recover punitive damages against Apex for Jackson's behavior, Miles asks us to follow the rule articulated in the Restatement (Second) of Torts, under which punitive damages can be assessed against a principal as a result of an agent's act if the agent was employed in a managerial capacity and acted in the scope of his employment.[57] Not all courts have agreed with this standard[58] and we need not decide the issue here. Assuming without deciding that the Restatement is the proper standard and that the steward was acting within the scope of his employment, we find no basis for an award of punitive damages. Jackson's mere tolerance of Melrose's drinking, while perhaps negligent, is not the type of outrageous conduct that justifies imposing punitive damages. The evidence was thus insufficient to present to the jury on the issue.
 
 VIII.
 
 49
 The district court dismissed both the plaintiff's and the defendants' suits against the Seafarers International Union for failure to state a claim, but only the defendants have appealed the dismissal. While they originally asserted claims in both tort and contract, the defendants concede that they have no contract claim against the union and abandon their argument that a union has a duty to investigate a member's background. The only theory on which they now rely is that when a union knows of a worker's violent nature and can foresee that he consequently may assault others, it has a duty under the general maritime law to warn the owners and operators of the vessel to whom it sends him.
 
 A.
 
 50
 The district court held that the collective bargaining agreement between the union and Apex Marine Corporation and Westchester Marine Shipping Company covers the alleged duty-to-warn tort claim. Under Sec. 301 of the Labor Management Relations Act of 1947,[59] a tort claim "inextricably intertwined with consideration of the terms of the labor contract" is preempted by federal labor-contract law.[60] A claim sufficiently independent of the collective-bargaining agreement, however, withstands the preemptive force of Sec. 301.[61] Thus, "[t]he threshold inquiry for determining if a cause of action exists, is an examination of the contract to ascertain what duties were accepted by each of the parties and the scope of those duties."[62]
 
 
 51
 The key question about the "independence" of the tort is whether the determination of liability under the tort claim requires an interpretation of the collective bargaining agreement.[63] For example, in Lingle v. Norge Division of Magic Chef, Inc.,[64] the most recent Supreme Court case addressing Sec. 301 preemption, a unanimous Court held that an employee's state law claim for retaliatory discharge was not preempted by a collective bargaining agreement, despite the contract provision protecting employees from discharge without "just cause." Since the facts required to show retaliatory discharge--that the employee was discharged and the employer's motive was to deter him from exercising his rights under the state worker's compensation act--did not require the court to interpret any term of the collective-bargaining agreement, the state law remedy was "independent" of the agreement.[65] That determination of the retaliatory discharge claim might involve analysis of the same facts as the determination whether the worker was fired for just cause under the contract is irrelevant. The Court explained, "Sec. 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements."[66]
 
 
 52
 The district court found the alleged duty-to-warn claim preempted by the job-referral provision of the SIU-Apex agreement.[67] Article I, Sec. 2 states in pertinent part:
 
 
 53
 The Union agrees to furnish the Company with capable, competent and physically fit persons when and where they are required, and of the ratings needed to fill vacancies necessitating the employment of Unlicensed Personnel in ample time to prevent any delay in the scheduled departure of any vessel covered by this agreement.... If, for any reason, the Union does not [meet the above commitment], the Company may then obtain members of the Unlicensed Personnel from any available source, in which case the Union shall be notified.
 
 
 54
 This provision, however, is concerned with when a vessel may bypass the union hiring hall to obtain crew members. It does not address whether the union has an obligation to warn the company when it knows of a member's violent propensities.
 
 
 55
 To establish the alleged duty-to-warn cause of action, a plaintiff would have to show that the union (1) knew a worker had violent propensities; (2) could foresee that he might injure other crew members; and (3) did not warn the shipowner. As in Lingle, this is a purely factual inquiry that does not require construing the collective-bargaining agreement. Since reference to the contract is not needed to resolve the issue of liability, the claim of a duty to warn is sufficiently independent of the contract and not preempted by Sec. 301.
 
 B.
 
 56
 We raise, sua sponte, the question whether the alleged tort claim is within the federal courts' admiralty jurisdiction,[68] since the alleged wrongful act, the failure of the union to warn the shipowner/operator, occurred on land. For a tort claim to invoke federal admiralty jurisdiction, the alleged wrong must have a maritime locality and bear a significant relationship to traditional maritime activity.[69] Under the locality test, a tort occurs "where the alleged negligence took effect," rather than where the negligent acts or omissions occurred.[70] The locality requirement is satisfied here since the injury, the exposure of Apex to liability for Torregano's death, occurred on navigable waters.[71]
 
 
 57
 The alleged tort is also significantly related to maritime activity.[72] The injury occurred to a seaman on a vessel at sea. The functions and roles of all the parties are inextricably tied to the maritime industry: the deceased and alleged assailant were seamen employed on a vessel, the third-party plaintiffs owned and operated the vessel, and the third-party defendant was a seamen's union. The law of admiralty, moreover, " 'has traditionally been concerned with furnishing remedies for those injured while traveling navigable waters,' "[73] and the plaintiff's claim that the vessel was unseaworthy is unique to maritime law. The alleged tort is thus within our admiralty jurisdiction.
 
 C.
 
 58
 We now turn to the issue whether a union has a duty under the general maritime law to warn a shipowner or operator with whom it has a collective bargaining agreement of the known violent propensities of a member sent to work on the owner's vessel. This alleged duty is much narrower than the duty to provide a safe workplace on which the union premises many of its arguments. The claim is not that the union had a duty to control Melrose, only that it failed to exercise ordinary care by telling Apex: "This man has a violent past." Since the injury is the exposure to liability for unseaworthiness and Jones Act negligence, the defendants' third-party claim is one for indemnity or contribution from the union for its negligence in causing the seaman's injuries.
 
 
 59
 We must assume for the purpose of deciding whether the claim is cognizable that the alleged negligence can be proved: the union knew Melrose was dangerous, could foresee that he would injure other crew members and thereby expose the vessel to liability, and the union's failure to warn the vessel was in fact the legal cause of the injury. The plaintiffs must also establish that the union owed it a duty of care that was breached by this negligence.
 
 
 60
 Under general tort law principles, there is no duty to warn a stranger of danger, no matter how grave or imminent. The Restatement (Second) of Tort Sec. 314 explains:
 
 
 61
 The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.
 
 
 62
 A comment to Sec. 314 indicates a limit to this principle applicable to our analysis:
 
 
 63
 The rule stated in this Section applies only where the peril in which the actor knows that the other is placed is not due to any active force which is under the actor's control. If a force is within the actor's control, his failure to control it is treated as though he were actively directing it and not as a breach of duty to take active steps to prevent its continuance.[74]
 
 
 64
 For example, a factory owner sees a blind man who has wandered into his factory, about to approach a piece of moving machinery. The owner is negligent if he permits the machinery to continue in motion when by the exercise of reasonable care he could stop it before the man comes into contact with it. The owner, who can control the machinery presenting the peril, is liable but a bystander is not.[75] Similarly, the union is no mere bystander. Through the internal policies and procedures of its hiring hall, the union sent Melrose to the M/V ARCHON, rather than stop the referral because it knew he was dangerous. In choosing not to exercise that control, but instead to permit the referral process to continue, the union is like the factory owner who is liable for allowing its machinery to continue in motion.
 
 
 65
 In addition, when the defendant stands in a special relationship with the injured party, the law may impose a duty to exercise reasonable care under the circumstances to protect that party from injury.[76] Thus the torts of third persons may render innkeepers liable to guests,[77] common carriers to passengers,[78] and prison officials to inmates.[79] As the reporters of the Second Restatement of Torts recognized twenty-five years ago, "The law appears ... to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence."[80] The shipowner or operator is particularly vulnerable and dependent upon the union because it must hire workers through the union hiring hall. In the context of the owner/operator's absolute liability if a worker does not meet the standard of his calling, this referral relationship is sufficient to impose a duty on the union to warn the vessel if it sends a dangerous seaman.[81]
 
 
 66
 Furthermore, the concern of maritime law with the safety of seamen is promoted more by allowing than by denying this third-party suit for indemnity or contribution. The shipowner is still absolutely liable for providing a seaworthy vessel; that duty does not shift to the union. Nevertheless, a union who knows and foresees that a member will injure others, when the employer lacks such knowledge, is in a unique position to prevent the harm by not referring him to a vessel. Allowing the vessel to seek indemnity from the union promotes the purposes of the doctrine of unseaworthiness by "plac[ing] liability on the party who was truly at fault and who should mend his negligent ways to prevent further injury."[82] To hold otherwise would shield the union from liability even if it referred a seaman who told union officials that he intended to kill a crew member when he got on board a vessel. Thus even though the harm here is not the seaman's physical injury, but the employer's exposure to economic liability, the seaman's safety can be promoted best by allowing the employer to seek indemnity or contribution for its economic loss.
 
 
 67
 Allowing such claims does not upset the established doctrines of general maritime law or labor law. The owner or operator of the vessel still warrants its seaworthiness. The union is not charged with a warranty as to the disposition of the crew or with any special duty to determine if a member is violent. It is merely required to exercise ordinary care when it in fact knows that a worker is a likely to harm other crew members. What the union knew and could foresee, as well as what constitutes ordinary care, are questions for the jury. Since the union already has the right not to send workers whose behavior is dangerous, its members are not additionally harmed by the union's exercising its lesser right to warn the shipowner of the danger.
 
 
 68
 We hold that because of the union's active role in sending workers to vessels, the special relationship between the union and the maritime employer, the union's unique ability to prevent the harm, and admiralty law's concern with the safety of seamen, the union has a duty under the general maritime law toward the owner or operator of a vessel to exercise reasonable care when it knows of a worker's violent propensities and can foresee that he consequently may assault other crew members and thereby expose the employer to liability. We reverse the district court's dismissal of the third-party claim and remand for factual development consistent with this opinion. In so doing, we intimate no view about the merits of the claim.
 
 
 69
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 [1]
 46 U.S.C.App. Sec. 688
 
 
 [2]
 Webb v. Dresser Indus., 536 F.2d 603, 606 (5th Cir.1976), cert. denied, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); 2 M. Norris, The Law of Seamen Sec. 27:2, at p. 194 (4th ed. 1985)
 
 
 [3]
 See Clevenger v. Star Fish and Oyster Co., 325 F.2d 397, 399-400 (5th Cir.1963); 1B Benedict on Admiralty Sec. 31 (1987)
 
 
 [4]
 See Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); 2 M. Norris, The Law of Seamen Sec. 30:35, at 488 (4th ed. 1985)
 
 
 [5]
 Clevenger, 325 F.2d at 402
 
 
 [6]
 See Claborn v. Star Fish & Oyster Co., 578 F.2d 983, 987 (5th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494 (1979)
 
 
 [7]
 Jones v. Lykes Bros. S.S. Co., 204 F.2d 815, 817 (2nd Cir.1953), cert. denied, 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370 (1953)
 
 
 [8]
 Boudoin, 348 U.S. at 339, 75 S.Ct. at 385
 
 
 [9]
 Smith v. Lauritizen, 356 F.2d 171 (3d Cir.1966); 1B Benedict on Admiralty Sec. 31, at 31-256
 
 
 [10]
 325 F.2d 397 (5th Cir.1963)
 
 
 [11]
 Id. at 402
 
 
 [12]
 578 F.2d 983 (5th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494 (1979)
 
 
 [13]
 Id. at 987
 
 
 [14]
 578 F.2d at 987
 
 
 [15]
 See id. at 986-87
 
 
 [16]
 Clevenger, 325 F.2d at 398
 
 
 [17]
 Id. at 402
 
 
 [18]
 Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969)
 
 
 [19]
 Claborn, 578 F.2d at 987; see also Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354 (1955)
 
 
 [20]
 Fontenot v. Teledyne Movible Offshore, Inc., 714 F.2d 17, 19 (5th Cir.1983)
 
 
 [21]
 1B Benedict on Admiralty Sec. 31, at 3-242 (1987)
 
 
 [22]
 Allen v. Seacoast Prods., 623 F.2d 355, 360 (5th Cir.1980)
 
 
 [23]
 See Fontenot, 714 F.2d at 19; see also 2 N. Norris, The Law of Seamen Sec. 27:19 (4th ed. 1985)
 
 
 [24]
 Fontenot, 714 F.2d at 19
 
 
 [25]
 See Pregeant v. Pan American World Airways, 762 F.2d 1245, 1250 (5th Cir.1985)
 
 
 [26]
 W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser and Keeton on the Law of Torts Sec. 125A-126, at p. 940-41 (5th Ed.1984) [hereinafter Prosser on Torts]
 
 
 [27]
 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)
 
 
 [28]
 Id. at 390, 90 S.Ct. at 1782
 
 
 [29]
 Id. at 409, 90 S.Ct. at 1792
 
 
 [30]
 Azzopardi v. Ocean Drilling & Exploration Co., 742 F.2d 890, 893 (5th Cir.1984); Law v. Sea Drilling Corp., 523 F.2d 793, 795 (5th Cir.1975); Barbe v. Drummond, 507 F.2d 794, 799-800 (1st Cir.1974); Spiller v. Lowe, 466 F.2d 903, 909 (8th Cir.1972)
 
 
 [31]
 See, e.g., Spiller, 466 F.2d at 909
 
 
 [32]
 819 F.2d 256 (9th Cir.), cert. denied, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987)
 
 
 [33]
 Evich, 819 F.2d at 258
 
 
 [34]
 See Moragne, 398 U.S. at 385, 90 S.Ct. at 1780
 
 
 [35]
 Id. at 390-91, 90 S.Ct. at 1782
 
 
 [36]
 See Evich, 819 F.2d at 258
 
 
 [37]
 See generally 2 Benedict on Admiralty Sec. 84, at n. 36 (7th ed. 1988)
 
 
 [38]
 See Torres v. Oakland Scavenger Co., --- U.S. ----, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988)
 
 
 [39]
 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974)
 
 
 [40]
 Id. at 585, 94 S.Ct. at 815
 
 
 [41]
 Id. at 583, 94 S.Ct. at 814 (emphasis in original)
 
 
 [42]
 Id
 
 
 [43]
 506 F.2d 716 (5th Cir.1975)
 
 
 [44]
 See Neal v. Barisich, Inc., 707 F.Supp. 862, 871 & n. 38 (E.D.La.1989)
 
 
 [45]
 770 F.2d 455 (5th Cir.1985), cert. denied, 475 U.S. 1019, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986)
 
 
 [46]
 Sistrunk, 770 F.2d at 459
 
 
 [47]
 See 46 U.S.C.App. Sec. 762
 
 
 [48]
 Ivy v. Security Barge Lines, Inc., 606 F.2d 524, 529 (5th Cir.1979) (en banc), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980)
 
 
 [49]
 Sistrunk, 770 F.2d at 460 (emphasis added)
 
 
 [50]
 See, e.g., N.Y. Est. Powers & Trusts Law Sec. 5-4.3
 
 
 [51]
 See, e.g., Conn.Gen.Stat.Ann. Secs. 52-555
 
 
 [52]
 See, e.g., Vt.Stat.Ann. tit. 14, Sec. 1492
 
 
 [53]
 See generally Prosser on Torts, supra, at pp. 23-25
 
 
 [54]
 Truehart v. Blandon, 672 F.Supp. 929, 938 (E.D.La.1987)
 
 
 [55]
 In Complaint of Merry Shipping, Inc., 650 F.2d 622, 626 (5th Cir.1981)
 
 
 [56]
 Id. at 624-25 (quoting In re Marine Sulphur Queen, 460 F.2d 89, 105 (2nd Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972))
 
 
 [57]
 See Restatement (Second) of Torts Sec. 909 (1964); Protectus Alpha Navigation Co. v. North Pacific Grain Growers, 767 F.2d 1379, 1386 (9th Cir.1985)
 
 
 [58]
 See, e.g., McGuffie v. Transworld Drilling Co., 625 F.Supp. 369 (W.D.La.1985)
 
 
 [59]
 29 U.S.C. Sec. 185
 
 
 [60]
 Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S.Ct.1904, 1912, 85 L.Ed.2d 206 (1985)
 
 
 [61]
 International Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 857-60, 107 S.Ct. 2161, 2166-67, 95 L.Ed.2d 791 (1987)
 
 
 [62]
 Id. at 859, 107 S.Ct. at 2167
 
 
 [63]
 See id.; Allis-Chalmers, 471 U.S. at 218, 105 S.Ct. at 1914-15 (1985)
 
 
 [64]
 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)
 
 
 [65]
 Id. at ----, 108 S.Ct. at 1882
 
 
 [66]
 Id. at ----, 108 S.Ct. at 1883
 
 
 [67]
 The Union cites other contract provisions that clearly do not address the facts alleged: the employer does not know the worker is violent and the union does. Thus the contract provision allowing the employer to reject or discharge such workers is inapplicable. Provisions that allow the union not to refer such workers concern the union's rights against its members, not the union's obligations toward the employer
 68 U.S. Const. art. III, Sec. 2.
 
 
 [69]
 Molett v. Penrod Drilling Co., 872 F.2d 1221, 1224 (5th Cir.1989); Woessner v. Johns-Manville Sales Corp., 757 F.2d 634, 639 (5th Cir.1985)
 
 
 [70]
 Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 266, 93 S.Ct. 493, 503, 34 L.Ed.2d 454 (1972)
 
 
 [71]
 See Molett, 872 F.2d at 1224
 
 
 [72]
 See Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); Parker by and through Parker v. Gulf City Fisheries, 803 F.2d 828, 830 (5th Cir.1986); Molett, 872 F.2d at 1224; see also id. at 1229-30 (Jones, J., concurring and dissenting)
 
 
 [73]
 Gulf City Fisheries, 803 F.2d at 830 (citing Kelly, 485 F.2d at 526)
 
 
 [74]
 Restatement (Second) of Torts Sec. 314 comment d (1964) (emphasis added)
 
 
 [75]
 See id. illustration 2
 
 
 [76]
 See Prosser on Torts, supra, at Sec. 56; see also Restatement (Second) of Torts Sec. 314A (1964)
 
 
 [77]
 Nordmann v. National Hotel Co., 425 F.2d 1103 (5th Cir.1970)
 
 
 [78]
 Skipper v. New Orleans Pub. Serv., 338 So.2d 771 (La.App.1976)
 
 
 [79]
 Parker v. State, 261 So.2d 364 (La.App.1972), aff'd, 282 So.2d 483, cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973)
 
 
 [80]
 Restatement (Second) of Torts Sec. 314 comment b (1964)
 
 
 [81]
 Cf. McKeithen v. S.S. FROSTA, 441 F.Supp. 1213, 1216 (E.D.La.1977) (dicta: pilots association may stand in special relationship to the owners of vessels to whom it assigns pilots)
 
 
 [82]
 Flunker v. United States, 528 F.2d 239, 243 (9th Cir.1975)